Filed 2/9/18 (unmodified opinion attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| SAMUEL DURAN et al.,<br><br>    Plaintiffs and Appellants,<br><br>v.<br><br>U.S. BANK NATIONAL ASSOCIATION,<br><br>    Defendant and Respondent. | A148817<br><br> (Alameda County<br>Super. Ct. No. 2001-035537)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br>[NO CHANGE IN JUDGMENT] |

BY THE COURT:[1]

It is ordered that the published opinion filed herein on January 17, 2018, be modified as follows:

At the end of the sentence that begins at the bottom of page 23 and ends at the top of page 24 with the words "*Bell*, *supra*, 115 Cal.App.4th 715," add the following footnote number 16:

> We note that we have scoured the appellate record in vain to locate plaintiffs' margin of error calculations. Factual matters that are not part of the record will not be considered on appeal and should not be referred to in a party's brief. (Cal. Rules of Court, rule 8.204(a)(2)(C); *Banning v. Newdow* (2004) 119 Cal.App.4th 438, 453, fn. 6.) This rule applies to matters referenced at any point in the brief, not just in the statement of facts. (*Lona v. Citibank, N.A.* (2001) 202 Cal.App.4th 89, 96, fn. 2; see also *Regents of University of California v. Sheily* (2004) 122 Cal.App.4th 824, 826–827, fn. 1 ["[i]t is not the task of the reviewing court to search the record for evidence that supports the party's statement; it is for the party to cite the court to those references"].)

> The following footnote will be renumbered as footnote 17.

---

[1] Humes, P. J., Margulies, J., Dondero, J.

The sentence that follows the new footnote, which reads, "However, the margins of error are artificially low because they are based on the total hours worked, and not overtime hours," is deleted.

The following sentence is revised slightly, to now read, "However, it is the comparison of the two surveys that reveals the inconsistency, irrespective of whether each survey is internally consistent within itself." Following this edited sentence, a new sentence is added, which will read: "Again, there is a difference of over nine hours between the two surveys' weekly overtime estimates."

This modification does not change the judgment.

The petition for rehearing is denied.

Dated: _____

Dondero, J.

2

Filed 1/17/18 (unmodified version)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| SAMUEL DURAN et al.,<br><br>Plaintiffs and Appellants,<br><br>v.<br><br>U.S. BANK NATIONAL ASSOCIATION,<br><br>Defendant and Respondent. | A148817<br><br>(Alameda County<br>Super. Ct. No. 2001-035537) |

In our second encounter with this class action case, plaintiffs Samuel Duran and Matt Fitzsimmons appeal from the trial court's order denying class certification. This case is a wage and hour class action challenging whether defendant U.S. Bank National Association (Bank) had properly classified its business banking officers (BBOs) as exempt employees under the outside salesperson exemption. This exemption applies to employees who spend more than 50 percent of their workday engaged in sales activities outside their employer's place of business. The trial court concluded plaintiffs failed to demonstrate that the case is manageable as a class action. We affirm.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

### I. *Background*

The factual background behind plaintiffs' claims and the procedural history of this case from its inception are well known to the parties and this court, and we will not repeat it here. In brief, the case centers on plaintiffs' allegations that they were misclassified as *outside* salespersons when they allegedly actually spent the majority of their working

hours *inside* Bank offices.[2]  Like the court below, we incorporate by reference pages 13 through 24 of the Supreme Court's opinion in *Duran*, *supra*, 59 Cal.4th 1.)  That decision affirmed our opinion reversing the judgment entered in favor of plaintiffs after a bench trial, leaving open that the trial court could "entertain a new class certification motion." (*Duran*, at p. 50.)  That new motion is the subject of the present appeal.

On July 7, 2014, the remittitur from *Duran* was filed and the case was reassigned to a new judicial officer on September 8, 2014, following the Bank's challenge to the original trial judge.

## II.     *Motions Regarding Certification*

On December 18, 2014, the Bank filed a motion to deny class certification.

On January 21, 2015, the trial court denied plaintiffs' request to reopen discovery, finding that the prior discovery was "very extensive."

Plaintiffs retained survey expert Jon A. Krosnick in connection with their opposition to the Bank's motion.  On February 1, 2015, Krosnick sent an " 'advance letter' " to putative class members, alerting them to an impending survey and the fact that they might be contacted.  The letter enclosed $2 as a "thank you" and promised an additional $25 to $35 for answering a 20-minute phone survey that would be "completely confidential."

On February 13, 2015, Ted Biggs, a senior vice president of the Bank, sent a letter to putative class members informing them of the Bank's belief that Krosnick's letter had been sent in connection with the pending lawsuit.  Among other things, Biggs disputed a statement in Krosnick's letter promising respondents that their identities would be kept confidential.

---

[2] An outside salesperson is one who "customarily and regularly works more than half the working time away from the employer's place of business" on sales duties.  (See Industrial Welfare Com., Wage Order No. 4-2001, subd. (2)(m).)  Here, there is no dispute that BBOs were primarily engaged in "sales."  (*Duran v. U.S. Bank National Assn.* (2014) 59 Cal.4th 1, 26 (*Duran*).)

On February 27, 2015, the trial court granted, in part, plaintiffs' ex parte application seeking, among other things, the authority to send a corrective mailing.[3] The court denied the Bank's corresponding ex parte application seeking to halt the survey and to bar further " 'unapproved' " communications with putative class members. The court found plaintiffs had a right to conduct the survey in order to support their opposition to the Bank's motion. At the same time, the court observed it was unclear "how a survey of putative class members in this unique context could help resolve the manageability issues" identified by the Supreme Court in *Duran*.

On April 30, 2015, plaintiffs filed an opposition to the Bank's motion to deny certification, characterizing their opposition as a cross-motion for class certification.[4] In support of their motion, plaintiffs included, among other things, an April 2015 survey report prepared by Krosnick (2015 Survey). In his report, he indicated his task had been "to conduct a survey of members of the Duran class with which to generate a menu of margins of errors for various possible numbers of witnesses who could testify at trial and answer questions to reveal the average number of hours they worked per week, the proportion of their work hours that were spent performing sales-related activities, and the proportion of their work hours that were spent performing outside sales-related activities." The 2015 Survey is described in more detail below.

On June 5, 2015, the trial court granted, in part, a motion to compel filed by the Bank, ordering plaintiffs to produce the identities of the 2015 Survey respondents and their survey responses. The court also ordered plaintiffs to produce the identities of those respondents to an earlier Krosnick survey (2008 Survey) who had also responded to the

---

[3] Apart from allowing plaintiffs to depose the Bank's senior vice president "in order to get to the bottom of what happened," the trial court denied plaintiffs' request to reopen discovery.

[4] The parties submitted extensive evidence to the trial court in connection with the class certification issue, much of which the court found to be "incredibly redundant."

5

2015 Survey, together with the 2008 Survey responses of those respondents.[5] In its order, the court observed plaintiffs had failed to provide a "separate detailed trial plan," even though this was "one of the most important take-aways from the Supreme Court's decision in this case."

On August 21, 2015, plaintiffs submitted an expanded trial plan. Plaintiffs proposed a bifurcated trial, with the liability phase focusing on " 'the ultimate question' " of whether the Bank had "realistic" expectations that BBOs could perform their job duties and meet the production goals of their position while spending more than half of their working time away from the office. As statistical evidence, they proposed using representative testimony with sample sizes ranging from 15 to 50 BBOs, having associated respective margins of error ranging from 11 percent to 5.53 percent. This liability phase would be followed by a restitution phase to determine the amount of money owed to the class, "[b]ased on the court's findings of the average hours worked per week by the randomly chosen BBOs who testify at trial." Plaintiffs proposed allowing the Bank to litigate its affirmative defense by calling BBOs outside the random sample, subject to the trial court's discretion to cut off the Banks' presentation of evidence under Evidence Code section 352.

On October 2, 2015, the Bank filed its reply brief, expanding the evidentiary record to include 66 additional declarations from BBOs who testified that they regularly spent the majority of their time outside Bank locations. The Bank also included a declaration prepared by its expert, Andrew Hildreth, which criticized the 2015 Survey and its methodology. In brief, Hildreth concluded the survey suffered from self-selection bias, as well as serious measurement and estimation errors.

---

[5] The 2008 Survey was ruled inadmissible during the first trial.

On November 13, 2015, plaintiffs filed their reply in support of their cross-motion for class certification, along with a third Krosnick report that addressed Hildreth's criticisms.

On March 25, 2016, the trial court, pursuant to Evidence Code section 730, appointed an independent expert, Kent D. Van Liere, to advise it on the survey science underpinning the parties' motions.[6]

---

[6] Evidence Code section 730 provides, in part: "When it appears to the court, at any time before or during the trial of an action, that expert evidence is or may be required by the court or by any party to the action, the court on its own motion or on motion of any party may appoint one or more experts to investigate, to render a report as may be ordered by the court, and to testify as an expert at the trial of the action relative to the fact or matter as to which the expert evidence is or may be required. The court may fix the compensation for these services, if any, rendered by any person appointed under this section, in addition to any service as a witness, at the amount as seems reasonable to the court." In a footnote in its order, the trial court asked that we give "further guidance on the use of [Evidence Code] Section 730 to appoint an expert as a court technical consultant," citing to *Diaz-Barba v. Superior Court* (2015) 236 Cal.App.4th 1470, 1490.

The use of experts to assist the court as consultants can be beneficial in complex cases. We note Federal Rules of Evidence, rule 706 also applies to court-appointed expert witnesses. Cases addressing this rule may prove helpful to our trial courts. As was observed in *Leesona Corp. v. Varta Batteries, Inc.* (S.D.N.Y. 1981) 522 F.Supp. 1304, 1312: "[A] court expert serves not only as a witness on whose opinion the Court can rely for assistance, but also as both a second set of ears for the court and a teacher who, unaffected by his having been called as a witness by one side or the other, can explain the technical significance of the evidence presented. [¶] Naturally a court will rely heavily on and give great weight to the testimony of its own expert . . . . Nevertheless, although a scientifically difficult patent case such as this is ideally suited to the appointment of a court expert pursuant to Rule 706, the appointment of such an expert does not remove from the trial court's shoulders the burden of understanding and becoming fully familiar with the technical questions in the case. The court expert serves to enhance the trial court's understanding, but it is the court, and not its expert, that decides the case."

California courts have acknowledged the value in court-appointed assistance from experts, especially in complex cases presenting issues beyond a trial judge's knowledge. (*People ex rel. Brown v. Tri-Union Seafoods, LLC* (2009) 171 Cal.App.4th 1549, 1573–1574; *Mercury Casualty Co. v. Superior Court* (1986) 179 Cal.App.3d 1027, 1032.)

7

On March 29, 2016, the Bank submitted a second declaration from Hildreth addressing new material contained in the third Krosnick report.

### III.    *Denial of Class Certification*

On May 19, 2016, the trial court filed its order denying class certification.  In its order, the court concluded plaintiffs had failed to carry their burden of showing that common questions predominated.  The court observed, "A primary factor in the *Duran* court's finding that the class may have been improvidently certified the first time around was its conclusion that the trial court had 'received no evidence establishing uniformity in how BBOs spent their time.' "  The court concluded that, apart from shoring up plaintiffs' trial plan, their statistical evidence "continues to fall short of the kind of showing of uniformity that the *Duran* court found necessary."  In spite of the voluminous evidence submitted by both parties, the court found "[t]he *only new material of any importance lies in the disputes between Krosnick and Hildreth*" (italics added).  The court determined the certification issue based on its resolution of those disputes.

Relying on Hildreth's analysis, the trial court concluded that two central flaws in the 2015 Survey operated to defeat plaintiffs' certification efforts:  (1) "the issues arising from the differences between the responses to the 2008 Survey and the responses to the 2015 Survey," and (2) "the related issue of Krosnick's use of total average hours worked per week rather than average overtime hours worked per week."  As to the second point, the trial court surmised that Krosnick had failed to understand plaintiffs' theory of liability.

In setting forth its reasoning, the trial court also indicated it was "initially satisfied" with how plaintiffs' trial plan proposed addressing the Bank's affirmative defenses.  However, upon finding the 2015 Survey data to be unreliable "*for any purpose*" (italics added), the court determined plaintiffs could not rely on the survey instrument in establishing a prima facie case.  Additionally, the court observed that representative sampling could not be used to establish an aggregate restitution award

8

because the proposed sample sizes were not scientifically supportable for that purpose. The court also found it would not be able to adequately manage the Bank's affirmative defense—that at least some class members worked most of their time outside the office— because the 2015 Survey failed to eliminate the need for "a host of 'mini trials.' "  In sum, the court concluded the pertinent factual questions "present severe manageability problems."  The court thus denied certification on the grounds that plaintiffs had failed to demonstrate common issues would predominate or that individual issues could be effectively managed.  This appeal followed.

## DISCUSSION

### I.    *Standard of Review for Class Certification*

The party seeking class treatment must show (1) an ascertainable and sufficiently numerous class, (2) a well-defined community of interest, and (3) substantial benefits from certification that render proceeding as a class superior to the alternatives.  (*Ayala v. Antelope Valley Newspapers, Inc.* (2014) 59 Cal.4th 522, 529–530 (*Ayala*); *Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1021 (*Brinker*).)  The "community of interest" requirement encompasses three factors:  predominant common questions of law or fact; class representatives with claims or defenses typical of the class; and class representatives who adequately represent the class.  (*Ayala,* at p. 530; *Brinker,* at p. 1021.)

The certification question is a procedural one that does not focus on the merits of the case.  (*Brinker*, *supra*, 53 Cal.4th at p. 1023; *Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 327 (*Sav-On*).)  In evaluating predominance, our Supreme Court explained:  "[A court] must determine whether the elements necessary to establish liability are susceptible of common proof or, if not, whether there are ways to manage effectively proof of any elements that may require individualized evidence."  (*Brinker,* at p. 1024; accord, *Ayala, supra,* 59 Cal.4th at p. 533.)  "The 'ultimate question' the element of predominance presents is whether 'the issues which may be jointly tried, when

9

compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants.' " (*Brinker,* at p. 1021; accord, *Duran, supra,* 59 Cal.4th at p. 28.) In addition, the trial court must consider whether individual issues, including those arising from affirmative defenses, can be managed fairly and efficiently. (*Duran*, at pp. 28–29; *Washington Mutual Bank v. Superior Court* (2001) 24 Cal.4th 906, 922–923; *Martinez v. Joe's Crab Shack Holdings* (2014) 231 Cal.App.4th 362, 378 (*Martinez*).)

We review the class certification ruling for an abuse of discretion. (*Ayala, supra,* 59 Cal.4th at p. 530; *Brinker, supra,* 53 Cal.4th at p. 1022.) Trial courts are afforded great discretion in granting or denying certification because they are ideally situated to evaluate the efficiencies and practicalities of permitting group action. (*Brinker*, at p. 1022; *Sav-On, supra,* 34 Cal.4th at pp. 326–327.) Generally, the trial court's ruling will not be disturbed unless it is unsupported by substantial evidence or rests on improper criteria or erroneous legal assumptions. (*Ibid*.; *Linder v. Thrifty Oil* (2000) 23 Cal.4th 429, 435–436.) In *Ayala,* our Supreme Court explained: "We review the trial court's actual reasons for granting or denying certification; if they are erroneous, we must reverse, whether or not other reasons not relied upon might have supported the ruling." (*Ayala,* at p. 530; accord, *Alberts v. Aurora Behavioral Health Care* (2015) 241 Cal.App.4th 388, 399; *Martinez, supra,* 231 Cal.App.4th at p. 373.)

## II.     Duran

In *Duran*, our Supreme Court discussed the use of surveys and statistical sampling as evidence to prove class action claims. "[I]f sufficient common questions exist to support class certification, it may be possible to manage individual issues through the use of surveys and statistical sampling. Statistical methods cannot entirely substitute for common proof, however. There must be some glue that binds class members together apart from statistical evidence. While sampling may furnish indications of an employer's centralized practices [citation], no court has 'deemed a mere proposal for statistical

10

sampling to be an adequate evidentiary *substitute* for demonstrating the requisite commonality, or suggested that statistical sampling may be used to manufacture predominate common issues where the factual record indicates none exist.' " (*Duran, supra,* 59 Cal.4th at p. 31; accord, *Martinez, supra,* 231 Cal.App.4th at p. 379; see *Tyson Foods, Inc. v. Bouaphakeo* (2016) 136 S.Ct. 1036, 1049 ["Whether a representative sample may be used to establish classwide liability will depend on the purpose for which the sample is being introduced and on the underlying cause of action."].)

Our Supreme Court in *Duran* noted that "the outside salesperson exemption has the obvious potential to generate individual issues because the primary considerations are how and where the employee actually spends his or her workday." (*Duran*, *supra,* 59 Cal.4th at p. 27.) The court stressed that "a statistical plan for managing individual issues must be conducted with sufficient rigor." (*Duran*, at p. 31; accord, *Mies v. Sephora U.S.A., Inc.* (2015) 234 Cal.App.4th 967, 985 (*Mies*).) The court noted that "[i]f the variability [in the class] is too great, individual issues are more likely to swamp common ones and render the class action unmanageable." (*Duran*, at p. 33.)

## III. *The Trial Court's Conclusions Regarding the 2015 Survey*

### A. *The 2015 Survey and Hildreth's Criticism*

Plaintiffs' theory of liability is that the Bank's uniform classification of the BBO position as exempt was unlawful because the position allegedly was designed as an inside sales/telemarketing job, and realistically could only be performed by spending the majority of time inside the bank. In its order denying certification, the court noted that plaintiffs' trial plan reported "[t]he stated purpose of the Krosnick survey was to determine the appropriate size of a sample group of witnesses needed to testify at trial in order to prove, by statistical inference [citation], Plaintiffs' theory of liability *and* an aggregate amount of restitution."

The trial court found plaintiffs satisfied the requirements of ascertainability, numerosity, and adequacy of representation. But the court ruled plaintiffs failed to show

11

common questions of law or fact predominated over individual issues. In addition, the court concluded class treatment was not superior to other means of resolving the claims because individual issues could not be properly managed. We find these conclusions are supported by substantial evidence, primarily in the form of Hildreth's declarations.

Krosnick reported that 160 class members were randomly selected for the survey. A total of 87 interviews were completed[7] and the response rate for the survey was 54 percent. He indicated that 95.45 percent of the respondents reported spending 50 percent or less of their work time performing outside sales-related activities. Ninety point ninety-one percent of respondents who stated they spent 50 percent or more of their work time performing sales-related activities also reported that they worked an average of 63.18 hours per week. Using the survey data, confidence intervals and margins of error were estimated for sample sizes relating to these findings, ranging from 15 to 50 people, with the results set forth in chart form. For example, as to the issue of time respondents had spent performing outside sales-related activities, a sample size of 15 people resulted in a margin of error of 11.01 percent, whereas a sample size of 50 people had a margin of error of 5.53 percent.

Hildreth summed up his opinion of the 2015 Survey by concluding Krosnick's "proposed 'menu' of potential sample sizes and accompanying margins of error is completely inaccurate. In reality, far larger sample sizes than those proposed would be required to approach the margins of error presented by Dr. Krosnick . . . ." Hildreth faulted the survey for having various forms of bias and error, as well as for its improper use of survey data. For example, Hildreth opined that the 2015 Survey was "a textbook example of self-selection bias" because it is based on a self-selected sample of respondents. By subtracting 40 hours from Krosnick's weekly hour figures, Hildreth also

---

[7] As the trial court noted, most of the tables in the technical appendix show the number of respondents as 66 rather than 87.

showed that the 2008 Survey produced estimates alternatively calculated at 13.82 or 14.39 overtime hours per week, whereas the 2015 Survey produced estimates of 23 overtime hours per week. Hildreth observed: "This significant difference between the two surveys, from the same population, is of an order of magnitude that illustrates the degree to which the statistics produced by the Krosnick surveys are not reliable." He also concluded that Krosnick had not offered any scientific or tested explanation as to why such a dramatic difference would have been produced by surveying the same population with the same questions.[8]

Hildreth opined that by comparing the total hours worked per week instead of average overtime hours per week, Krosnick had masked the extent to which the values in the two surveys differed. Krosnick's methodology minimized the difference between the two surveys' results and the associated estimated margins of error. Hildreth's analysis demonstrated that a statistical comparison of the overtime hours only (versus total hours worked) showed that the responses given by the same respondents "are so different they might as well be *completely unrelated*." He concluded that if Krosnick's methodology were used to estimate the average hours of *overtime* worked per week, "testimony from the whole putative class would potentially be required to produce an acceptable relative or absolute margin of error . . . ."

### B. The Trial Court's Reasoning

The trial court started from the premise that in the absence of a viable "trial ready" trial plan, "certification must be denied." The court first noted the need for plaintiffs to show predominance, which was contingent on the 2015 Survey data: "Plaintiffs need the survey to support selection of a sample size for the liability phase, to provide a basis for

---

[8] Hildreth also reported that 18 individuals responded to both the 2008 Survey and the 2015 Survey. The average for the 18 matched responses from the same individuals shows an increase in the purported average hours worked per week by an average of 5.8 hours. All but two individuals had changed their estimates, with six people reporting fewer hours and 10 others increasing the hours they worked.

13

an aggregate restitution determination and also, in this case, to provide some comfort to the court that [the Bank's] affirmative defense will not lead to a proliferation of mini[] trials in the first phase of the case."

The trial court then focused on manageability, specifically, on the need for the trial plan to adequately address both liability with respect to plaintiffs' prima facie case, as well as the Bank's affirmative defense of the outside sales exemption. While initially satisfied with the manner in which the proposed trial plan had anticipated addressing the Bank's affirmative defense, the court concluded plaintiffs could not establish a prima facie case as to liability because the 2015 Survey data was unreliable for any purpose.

Second, even if the liability phase was allowed to proceed, the trial court determined that there was no manageable way to determine an aggregate restitution award using representative sampling because "the sample size is not scientifically supported for this purpose." The damages phase of the trial would thus require testimony from each class member, leading to a "host of 'mini trials.' " Finally, because of the unreliability suggested in the comparison between the 2008 and 2015 surveys, the court concluded that, as with the issue of restitution, "the affirmative defense [that at least some class members in fact worked most of their time outside the office] would [also] appear to require a host of 'mini trials.' "

The trial court found the differences between the responses to the 2008 Survey and the responses to the 2015 Survey, along with Krosnick's use of total average hours worked per week rather than average overtime hours worked per week, to be dispositive of the certification issue. The first court noted that the 2008 Survey solicited essentially the same information as the 2015 Survey with respect to the total hours worked per week, yet the responses to the 2008 Survey yielded an average of 53.76 hours, whereas the 2015 Survey yielded an average of 63.18 hours. We concur with the court's observation that "[e]ven a non-mathematician can readily see that this is a difference of nearly ten hours per week, which is a large number in this context."

14

The trial court found this discrepancy to be "tangible evidence" supporting Hildreth's arguments regarding self-interest bias, tainting subject matter areas that were covered by the 2015 Survey only, namely, whether respondents spent most of their time inside or outside of the office. The bias identified by Hildreth could have skewed *all* the survey results upwards, potentially requiring a larger sample size for plaintiffs to prove their liability theory, as well as increasing the number of class members the Bank would call to establish its affirmative defense.

The trial court found that a separate problem arose from plaintiffs' proposal to use the same randomly selected witness group for the fixing of aggregate damages. The court noted that Krosnick had used average total hours worked per week rather than average overtime hours worked per week in his calculations. This choice was problematic because the difference in total hours worked "yields significantly different variation calculations than a comparison between far smaller numbers—here, the overtime hours derived by subtracting 40 from the total hours." The court agreed with Hildreth that in the context of restitution, the focus had to be on overtime hours, not total hours worked. The variation within the class would be much greater in the overtime context, and "the necessary sample size needed to achieve the relative margin of error found acceptable by the court in [*Bell v. Farmers Ins. Exchange* (2004) 115 Cal.App.4th 715 (*Bell*)] is driven up dramatically."[9]

The trial court concluded that the 2015 Survey results "do not support the conclusion that—given the small class size in this case—a sample group of any size smaller than the entire class could ever yield an aggregate restitution award 'as a matter of just and reasonable inference.' [Citation.] In other words, the experience of each class member would need to be tested not only to determine his or her individual share, but

---

[9] In *Bell*, the parties' experts estimated average weekly overtime hours at 9.4 hours, with a plus/minus 0.9-hour margin of error. *Bell* involved a random sample of nearly 300 individuals. (*Bell*, *supra*, 115 Cal.App.4th at pp. 753, 755–756.)

15

also to arrive at an aggregate amount of restitution in the first place. This, of course, has severe manageability implications." Although the court found that a survey like the 2015 Survey could theoretically be used to support a finding as to whether the Bank's policy of classifying all class members as exempt employees was lawful, it concluded that a comparison between the overlapping portions of the 2008 and 2015 surveys "demonstrates that the data from the 2015 Survey is not sufficiently reliable for Plaintiffs' intended use."

We agree with the trial court that, at this point, the viability of plaintiffs' motion to proceed as a class action is critically dependent on the evidentiary value of the 2015 Survey. As the *Duran* court noted, the lower court in the prior trial "received *no evidence* establishing uniformity in how BBOs spent their time." (*Duran*, *supra*, 59 Cal.4th at p. 32.) The disparity between the estimated overtime hours worked per week as reported in the 2008 and 2015 surveys (approximately 14 hours in 2008 versus 23 hours in 2015) is more than enough to convince us that substantial evidence supports the court's decision to deny certification. The overtime figure nearly doubled in the 2015 Survey, with a difference of almost 10 hours per person per week on average. Plaintiffs do not satisfactorily explain this discrepancy, which the lower court found to have "taint[ed] the use of the 2015 Survey not only on the subject matter where the two surveys overlap but also on the subject matter covered only by the 2015 Survey—to wit, where respondents say they spent most of their time, whether it was inside or outside the office." We conclude the court did not abuse its discretion in ruling that the 2015 Survey is unreliable for the purpose of showing that common issues would predominate at trial. We proceed to specifically address plaintiffs' arguments on appeal.

## IV.    *Plaintiffs' Arguments*

### A. *Whether the Trial Plan Adequately Manages the Affirmative Defense*

As part of its ruling, the trial court stated that plaintiffs' trial plan "fails to resolve the manageability issues posed by the affirmative defenses, and specifically the argument

16

that at least some of the class members in fact worked most of their time outside the office." Plaintiffs assert this passage indicates the court erroneously believed that a liability determination in a misclassification case must identify which class members were misclassified. They claim their theory of the case, that the Bank did not have a realistic expectation that its BBOs would primarily engage in outside sales activities, is fully consistent with *Duran,* and assert any finding of liability on this point would be equally applicable to all BBOs.

Plaintiffs rely heavily on Justice Liu's concurrence in *Duran*, *supra*, 59 Cal.4th 1 and on *Martinez*, *supra*, 231 Cal.App.4th 362 in asserting that " 'the ultimate question is: what are "the *realistic* requirements of the job?" ' "[10] Plaintiffs argue that liability in a misclassification case is determined based not on how employees actually spend their time, but rather on whether the employer realistically expected employees to spend the majority of their time on exempt duties. In their view, if an employer did not realistically expect employees to spend the majority of their time on exempt duties, then its classification of the position as exempt is unlawful and liability is thereby established for the entire class, even for those class members who actually spent the majority of their time on exempt duties.

Justice Liu's concurrence did not alter the *Duran* court's conclusion that "the question is 'first and foremost' how the employee's time is actually spent." (*Duran*, *supra*, 59 Cal.4th at p. 27.) Instead, the concurrence was drafted "to further elucidate the proper inquiry at the class certification stage of an employee misclassification case and the duty of the trial courts to manage individual issues in a class action trial. (*Id.* at

---

[10] Indeed, in their reply brief plaintiffs assert that their appeal is centered on "how to interpret Justice Liu's statement in *Duran* that an employee who exceeds the 50% outside-sales threshold should be classified as non-exempt—i.e., eligible for overtime pay—if devoting that much time to outside sales is not a realistic requirement of the job." A concurrence is not the opinion of the court and is not binding. (*People v. Amadio* (1971) 22 Cal.App.3d 7, 14.)

17

p. 51.)  Justice Liu sought to reemphasize that in some cases, an employer's "realistic expectations" or the "*realistic* requirements of the job" may be shown by common proof. (*Id*. at pp. 52–53.)  Specifically, he sought to address "[w]hat would it mean to 'manage individual issues' in the context of an employee misclassification case?"  (*Id.* at p. 55.) He then set forth two ways for a trial court to frame a representative sampling approach to proving class liability.  First, he advised that consideration of individual issues should inform the design of any sampling or similar statistical approach.  Second, he acknowledged that a defendant is entitled to raise individual issues that challenge the results of a valid sampling plan as implemented.  (*Duran*, at pp. 55–56.)  It does not appear to us that the concurrence is inconsistent with the majority opinion or that it suggests a different standard should apply when analyzing certification motions.

In *Martinez,* the appellate court concluded the trial court abused its discretion by denying the plaintiffs' motion for certification of a class of salaried managerial employees who had allegedly been misclassified.  The plaintiffs alleged that the employer's operations, hiring, training, and other practices were uniform throughout the restaurant chain.  Because the restaurants were typically understaffed, managers routinely filled in where needed, working as cooks, servers, bussers, hosts, stockers, bartenders, and kitchen staff.  (*Martinez, supra,* 231 Cal.App.4th at pp. 368–369.)  Each of the plaintiffs' declarants estimated he or she had spent the majority of time performing such hourly tasks, but later admitted they were unable to estimate the amount of time spent on exempt versus nonexempt tasks.  (*Id.* at pp. 369, 371.)  The trial court found all putative class members performed similar duties and responsibilities pursuant to a finite task list. (*Id*. at p. 371, fn. 12.)  But it concluded the plaintiffs' claims were not typical and they were inadequate class representatives because they were unable to estimate the number of hours spent on individual exempt and nonexempt tasks and their job duties varied from day to day.  Common questions did not predominate because there were "significant individual disputed issues of fact relating to the amount of time spent by individual class

18

members on particular tasks," and such variability would require adjudication of the affirmative defense of exemption for each class member. (*Id*. at pp. 371–372.)

The Court of Appeal reversed. Citing *Ayala, supra,* 59 Cal.4th 522, *Martinez* cautioned that courts should "avoid focusing on the inevitable variations inherent in tracing the actions of individuals and to instead focus on the policies—formal or informal—in force in the workplace." (*Martinez, supra,* 231 Cal.App.4th at p. 380.) The plaintiffs' theory of liability—that by classifying all managerial employees as exempt, the employer had violated overtime laws—was " 'by its nature a common question eminently suited for class treatment.' " (*Ibid.*) Significant common issues pervaded: the employer operated a chain of restaurants governed by the same policies and procedures; exempt employees were expected to work at least 50 hours per week; and the parties had identified a finite task list, suggesting jobs were " 'highly standardized.' " (*Ibid.*) The "gist of plaintiffs' claim" was that "regardless of the patina of managerial discretion expressed in their job description, they functioned consistently as utility workers, cross-trained in all tasks, who could be assigned to fill in where needed without affecting the labor budget or requiring overtime compensation. The crux of the matter, therefore, lies in whether a typically nonexempt task becomes exempt when performed by a managerial employee charged with supervision of other employees." (*Id.* at p. 381, fn. omitted.)

*Martinez* also reasoned that under *Sav-On,* "courts in overtime exemption cases must proceed through analysis of the employer's realistic expectations and classification of tasks rather than asking the employee to identify in retrospect whether, at a particular time, he or she was engaged in an exempt or nonexempt task." (*Martinez, supra*, 231 Cal.App.4th at p. 382.) "The court here must ask whether [the employer's] realistic expectations and the actual requirements of the job resulted in the exercise of supervisorial discretion by managerial employees or instead relegated employees to [a] utility role." (*Id*. at p. 383.) By focusing on the employees' inability to identify what tasks they performed and for what purpose, *Martinez* concluded the trial court had failed

19

to consider *Sav-On*'s explicit direction that courts need not assess an employer's affirmative exemption defense against every class member's claim before certification. (*Ibid.,* citing *Sav-On, supra,* 34 Cal.4th at pp. 337–338.)

*Martinez* is distinguishable in that the central dispute here is where BBOs spent the majority of their time, and not on whether they spent the majority of their time on exempt tasks. Unlike *Martinez,* the crux of the matter here is not task classification. Instead, the issue is how much time each putative class member spent outside the Bank's locations. As the trial court stated, "a declaratory judgment that the policy was unlawful would resolve *nothing* because to determine restitution each claimant would have to be called to testify as to where he or she spent most of their time and how much overtime they worked. Thus a declaratory judgment on the policy, standing alone, serves no purpose." The court conceded that the result might have been different "if a bona fide statistical survey provided reason to believe that only a few class members may have been properly classified and those could be readily identified; but the survey evidence here provides no such assurance."

In our view, the trial court properly focused on manageability issues pertaining to the affirmative defenses, while fully understanding plaintiffs' theory of liability.[11] In the

---

[11] The trial court accurately described plaintiffs' theory of the case as follows: "Plaintiffs assert that because the BBO position was designed, managed and monitored as an inside sales job, and as a consequence that is how the BBOs uniformly spent their time, Defendant violated mandatory overtime wage laws by classifying all BBOs as exempt. They intend to show, if given the chance, that it was not realistic for Defendant to expect that putative class members would be able to perform the duties and meet the production goals of the BBO position by 'customarily and regularly work[ing] more than half the working time away from the employer's place of business selling tangible or intangible items or obtaining orders or contracts for products, services or use of facilities' [citation]. In other words, Plaintiffs intend to show that Defendant 'had a consistently applied policy or uniform job requirements and expectations contrary to a Labor Code exemption.' [Citation.] Under this theory, the focus of the liability inquiry would be on the 'realistic requirements of the [BBOs] job' [citation], i.e., whether it was realistic for Defendant to expect that the BBOs would be 'outside' more than half of the time, given

portion of the court's decision about which plaintiffs complain, the court observed that if "the vast majority of the class sample would credibly testify that most of their time was spent inside the office and the confidence interval was relatively narrow, then one might infer that the number of witnesses the defense would call on its affirmative defense would be relatively small. But if the results relied upon by Krosnick are as unreliable as suggested by a comparison of the 2008 and 2015 surveys, then the court cannot take much comfort in the notion that Plaintiffs' trial plan adequately manages the affirmative defenses. As with the issue of restitution, the affirmative defense would appear to require a host of 'mini trials.' "[12]

Even if the trial court did err in its assessment of plaintiffs' theory, in the same section of its decision containing the passage quoted above, the court also faulted their trial plan because, given the overall unreliability of the 2015 Survey, there was no way for plaintiffs to establish a prima facie case on the issue of liability. Additionally, the court concluded that even if the liability phase were to proceed, plaintiffs would not be able use representative sampling to establish an aggregate restitution award. Thus, the court found multiple flaws in plaintiffs' trial plan.[13]

---

the nature of their job duties and performance expectations. Such a finding would be based on evidence of the actual experiences of putative class members who were 'getting the job done' as to where they spent their time doing so."

[12] Trial courts must determine whether individual issues, including those arising from affirmative defenses, can be managed fairly and efficiently. The Supreme Court in *Duran* stated: "If statistical evidence will comprise part of the proof on class action claims, the court should consider *at the certification stage* whether a trial plan has been developed to address its use. A trial plan describing the statistical proof a party anticipates will weigh in favor of granting class certification if it shows how individual issues can be managed at trial." (*Duran*, *supra*, 59 Cal.4th at pp. 31–32.) However, the court cautioned, "a class action trial management plan may not foreclose the litigation of relevant affirmative defenses, even when these defenses turn on individual questions." (*Id.* at p. 34.)

[13] To the extent plaintiffs criticize the trial court for relying on *Teamsters v. United States* (1977) 431 U.S. 324, we find no error. The court did not rely on *Teamsters* in its

It is established that even when the party proposing a class asserts "the employer consistently imposed a uniform policy or de facto practice on class members, the party must still demonstrate that the illegal effects of this conduct can be proven efficiently and manageably within a class setting." (*Duran, supra,* 59 Cal.4th at p. 29; see *Koval v. Pacific Bell Telephone Co.* (2014) 232 Cal.App.4th 1050, 1060 ["existence of a uniform policy does not limit a trial court's inquiry into whether class action treatment is appropriate"] and *Arenas v. El Torito Restaurants, Inc.* (2010) 183 Cal.App.4th 723, 734 ["trial court concluded plaintiffs' theory of recovery—that managers, based solely on their job descriptions, were as a rule misclassified—was not amenable to common proof" given evidence employees' "duties and time spent on individual tasks varied widely"].) "To the contrary, 'courts have routinely concluded that an individualized inquiry is necessary even where the alleged misclassification involves application of a uniform policy. " (*Mies, supra,* 234 Cal.App.4th at p. 984.)

Plaintiffs also fault the trial court for rejecting its proposal to address how to proceed if evidence on the average hours worked produced an unacceptable margin of error. In that case, they had proposed the parties could continue to submit evidence "until the margin of error reached an acceptable number." The trial court rejected this proposal, stating that "it is too late in this litigation for another 'provisional' certification order that is subject to a further development of a trial plan." Given that this case has lasted well over a decade and that one trial has already occurred and been reversed, and that two appellate court decisions on this matter have already been issued, we fully support the trial court's sentiment on this point. Additionally, the Supreme Court in *Duran* specifically stated: "The trial court is of course free to entertain a new certification motion on remand, but if it decides to proceed with a class action it *must apply the*

decision, but instead was simply quoting a passage in *Duran* in which the Supreme Court criticized *plaintiffs* for relying on *Teamsters.*

*guidelines set out here,*" including assessing manageability of affirmative defenses. (*Duran*, *supra*, 59 Cal.4th at p. 33, italics added.)

### B. Variation in Restitution

Plaintiffs also claim the trial court erred by finding that variation in restitution defeats certification. They start off on the wrong foot, however, by asserting that the trial court "held that plaintiffs satisfied the requirements for predominance and manageability with respect to liability." Actually, the court found that the 2015 Survey, if it had been the *only* survey, might have been used to measure the extent of variation within the class on the issue of whether BBOs spent more than half of their time in the office. However, this observation was tempered by the court's acceptance of Hildreth's opinion that self-interest bias caused respondents to overestimate the time spent inside the office. This bias, the existence of which was supported by the discrepancies between the two Krosnick surveys, suggested to the court that individual variations would necessitate a larger sample size than plaintiffs suggested. Thus, even apart from restitution, the court did not find that the 2015 Survey supported a finding of predominance and manageability with respect to liability.

On the issue of restitution, plaintiffs assert the trial court erred in concluding the survey was going to be used as the sole basis for fixing the amount. However, even plaintiffs admit that the testimony of the randomly drawn sample "would have been a substantial factor in the court's ultimate determination of the amount of restitution." Plaintiffs proposed establishing aggregate restitution by using the trial court's finding of average overtime hours worked by a representative witness group (the size of which would be based on the flawed 2015 Survey), which would then be extrapolated and applied in the second phase of trial to the individual BBOs' payroll records to determine each individual's recovery.

We cannot conclude the trial court committed legal error in its assessment of the impact the 2015 Survey evidence would have in the manageability of the restitution

23

phase of trial. Whether the court was correct in concluding that no sample of any size less than the entire class could ever yield an aggregate restitution award, the fact remains that the 2015 Survey evidence offered by plaintiffs was seriously flawed, leaving the court with no alternative except to anticipate that every class member would need to testify.[14] The court properly rejected Plaintiffs' plan for determining aggregate restitution because the plan rested on a survey that was wholly unreliable.

Plaintiffs also contend the trial court erred by holding them to a higher standard than required by law with respect to the determination of an aggregate restitution award. Contrary to plaintiffs' argument, the court was not holding them to a higher standard. Instead, it was stating its view of the state of the evidence, specifically, that the 2015 Survey was worthless as a sampling tool, necessarily requiring each class member's testimony as to restitution.

## V. Rejection of 2015 Survey

Plaintiffs use the final arguments in their opening brief to address the central issue in this appeal, namely, whether the trial court erred in rejecting the 2015 Survey. They first assert that the survey "satisfied all of *Duran's* conditions for the use of statistical evidence in a class action." As they note, however, one of these requirements is that the margin of error cannot be "intolerably high." *(Duran, supra*, 59 Cal.4th at p. 46.)

The trial court rejected the 2015 Survey because of the difference between the average hours worked as reported in the 2008 Survey versus the 2015 Survey. Again, the 2008 Survey reported an average of approximately 54 hours per week, while the 2015 Survey reported an average of approximately 63 hours per week. Because the court could not reconcile the differences between the two surveys, it concluded the 2015

---

[14] Plaintiffs' related argument that the burden should have been on the Bank as the employer to come forward with evidence as to the number of hours worked because it had kept inaccurate or incomplete records has been addressed previously in *Duran*, *supra*, 59 Cal.4th at p. 41.

Survey estimate of the amount of time BBOs were engaged in outside sales work was also unreliable. Plaintiffs argue that in doing so "the trial court exercised its discretion in a way contrary to the internal rules governing statistical analysis." Their arguments are not persuasive.

Plaintiffs first attribute the discrepancy in the memories of the class members to "the passage of time," noting the class period goes back to December 1997. Thus, in 2015, members were being asked to recall events up to 17 years earlier.[15] Plaintiffs appear to urge the differences do not matter here because these same discrepancies will occur whether the trial proceeds on an individual basis or a class action basis.[16] We disagree. In individual actions, the effects of the passage of time upon each witness's memory can be explored by the fact finder. In a class action, it is impossible to do so, and plaintiffs do not advance any scientific principles suggesting that statistical evidence can be used to accurately reflect the impact of the passage of time on survey respondents in a manner that can be extrapolated to the class as a whole. While plaintiffs argue again that the burden of uncertainty should not be shifted to them because the Bank failed to keep accurate records, the fundamental inquiry here is whether this matter can proceed as a class action, not which party is to blame for the fact that plaintiffs' evidence fails to support a finding of commonality.

Plaintiffs also argue that the difference between the average hour estimates from the two surveys is not important because the estimates independently have low relative margins of error. They note the 2008 Survey had a relative margin of error of 13.50 percent while the corresponding margin of error in the 2015 Survey was 14.96 percent,

---

[15] The trial court was well aware of this point, noting the "gaps in the passage of time between the underlying events and the surveys and between the surveys themselves are unusually large . . . . Some of the problems here may be traced to this circumstance."

[16] As an aside, this argument does little to inspire confidence in the 2015 Survey results.

observing that we approved a 9.57 percent relative margin of error in *Bell*, *supra*, 115 Cal.App.4th 715.  However, the margins of error are artificially low because they are based on the total hours worked, and not overtime hours.  Further, it is the comparison of the two surveys that reveals the inconsistency, irrespective of whether each survey is internally consistent within itself.

Plaintiffs' final argument—that the Bank and its attorneys skewed the results of the 2015 Survey by sending the Biggs letter to putative class members—is not well taken.  Plaintiffs do not cite to any evidence in the record suggesting that the letter "infuse[d] the survey with bias."

In sum, the trial court did not abuse its discretion in concluding that the wide discrepancy between the 2015 and 2008 survey results demonstrated that the 2015 Survey was unreliable, and served as tangible evidence that the survey results were tainted by bias.  Accordingly, substantial evidence supports the court's finding that the survey data was unreliable as evidence of uniformity in how BBOs spent their time, and unreliable as statistical support for selecting a representative witness group to testify as to liability or restitution without causing the inquiry to devolve into a multiplicity of individual mini trials, especially in light of the Bank's right to call witnesses outside the sample to establish its affirmative defense.[17]

---

[17] After oral argument and the submission of this case, plaintiffs requested this court to consider an appellate case, now published, on employment class actions.  The case is *ABM Industries Overtime Cases* (Dec. 11, 2017, A132387, A133077, A133695) ___ Cal.App.5th ___ [2017 WL 6887032] (*ABM Industries*).  We have decided to review the case and find it clearly distinguishable from our matter.

First of all, *ABM Industries* involved the denial of class certification where the employees' witness, Woolfson, the *sole* expert on either side concerning the issue of class certification, was found by the trial court to be unqualified.  The employer had offered no expert to challenge the employees' witness.  Indeed, "ABM had failed to lodge a formal objection to the evidence [of the employees' expert], move to strike the [expert's] declaration, depose Woolfson on his credentials or conclusions, and/or provide their own contrary expert opinion." (*ABM Industries, supra*, ___ Cal.App.5th ___ [2017 WL

26

## DISPOSITION

The order denying class certification is affirmed.

---

6887032, at p. 5].)  Based on the record, the appellate court concluded the trial court had engaged in an abuse of discretion in excluding the employees' expert evidence.  (*Id*. at p. 6.)

In our case, the trial court did not exclude Krosnick's expert evidence. Importantly, the trial court fully considered the evidence offered by both sides' expert witnesses.  In a lengthy opinion, the court found the certification issue focused on the credibility of expert testimony and concluded the Bank's witness was more credible, as noted in our discussion.

Additionally, in *ABM Industries*, the trial court rulings on the admissibility of the expert Woolfson's testimony had a serious impact on the certification question.  "[W]e conclude that the trial court's denial of class certification—including its decision regarding the admissibility of the Woolfson materials—rested on improper criteria and erroneous legal assumptions, amounting to an abuse of discretion."  (*ABM Industries, supra*, ___ Cal.App.5th ___ [2017 WL 6887032, at p. 18].)

In contrast, our ruling enjoys the benefit of full review of the employment issues at U.S. Bank not only by this court on two occasions, but also the full assessment by our Supreme Court.  In a word, we find the circumstances of the BBOs to be easily distinguishable from the circumstances of the janitors employed by ABM Industries discussed in plaintiff's latest authority.

27

_____
Dondero, J.

We concur:


_____
Humes, P. J.


_____
Margulies, J.

*A148817  Duran et al. v. U.S. Bank National Association*

28

Trial Court:             Alameda County Superior Court

Trial Judge:            Hon. Wynne Carvill

Counsel:

      Wynne Law Firm, Edward J. Wynne, for Plaintiffs and Appellants.

      Carothers Disante & Freudenberger LLP, Timothy M. Freudenberger, Alison L. Tsao, Kent J. Sprinkle, Robin E. Largent, Teresa W. Ghali, for Defendant and Respondent.

*A148817  Duran et al. v. U.S. Bank National Association*