Filed 6/22/23  P. v. Robinson CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E078986 |
| v. | (Super.Ct.No. FVI21002038) |
| ROBERT LEE ROBINSON, JR., | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Kawika Smith, Judge.  Affirmed.

Pauline E. Villanueva, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, and Robin Urbanski and Laura Baggett, Deputy Attorneys General, for Plaintiff and Respondent.

After finding defendant and appellant, Robert Lee Robinson, Jr., in violation of his probation, the court terminated his probation and sentenced defendant to the aggravated term of four years of imprisonment. On appeal, defendant contends the court abused its discretion in imposing the upper term. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND[1]

On July 21, 2021, while they were sitting in a car at church, defendant punched the victim approximately six times with a closed fist; he threatened to kill her. The victim sustained "visible significant swelling on her lips and appeared to have the start of bruising on her face as well." The victim believed that defendant was going to kill her.

The People charged defendant by felony complaint with cohabitant abuse (Pen. Code, § 273.5, subd. (a), count 1)[2] and criminal threats (§ 422, subd. (a), count 2). On August 2, 2021, pursuant to a negotiated plea, defendant pled no contest to the count one offense. In return, upon the People's motion, the court dismissed the remaining count.

As provided in the plea agreement, the court placed defendant on 36 months of probation. The court noted that if defendant violated his probation, he could be sentenced to up to four years in prison. As a term of defendant's probation, the court issued a criminal protective order prohibiting defendant from contact with the victim.

On August 26, 2021, a petition for revocation of defendant's probation was filed alleging defendant had failed to comply with the terms of his probation by failing to

---

[1] Counsel stipulated that the complaint and police report would provide a factual basis for the plea.

[2] All further statutory references are to the Penal Code.

report to his probation officer.  On October 22, 2021, pursuant to the court's indicated sentence, defendant admitted violating the terms of his probation by failing to report to his probation officer; the court reinstated defendant's probation and ordered him to serve 180 days in jail.

On December 20, 2021, another petition for revocation of defendant's probation was filed alleging defendant had violated the terms of his probation when he was arrested for committing battery in the presence of the victim.  On April 19, 2022, at the contested hearing on revocation of defendant's probation for violating the protective order, a witness testified that on December 15, 2021, she received a call that defendant was with the victim.  The witness drove to the location.  Defendant was at the victim's home, but the victim would not let defendant inside.

The witness began video recording defendant.  Defendant said, " 'Don't be taking no pictures of me.'  And then all of a sudden he struck me.  He hit me on this side of my face and then my glasses and my cell phone fell out my hand . . . ."  "He just start swinging, you know, and he hit me."

The victim got into the back of the car belonging to the witness.  The witness called the police.  Defendant twice hit the window of the vehicle on the side on which the victim was seated.  The witness thought defendant was going to break the window.  Prior to the incident, the witness would regularly see defendant and the victim together at church.

3

The victim's father testified that on December 15, 2021, he, his wife, and the witness went to the victim's house. Defendant was standing outside. Defendant hit the witness in the face with a closed fist.

An officer testified she was dispatched to the location of the incident where she was flagged down by the witness. Defendant was detained 70 yards from the victim's residence. Defendant denied hitting the witness but admitted taking the phone out of her hand.

The officer watched the video recorded by the witness; she "saw the defendant approach her in an intentional and purposeful movement and quickly, in an aggressive manner, and he was yelling, I'm not too sure what, then you see the video shake and, which appeared to me that the phone was either grabbed or moved by someone."

The officer testified she had personally been called out to the home for incidents between defendant and the victim three to four times between August 2 and December 15, 2021. "Like I said, I've been out there several times [regarding] disturbances between the two. The defendant has been told numerous times not to return to the residence. He's aware of the restraining order." "[W]e have had issues and multiple contacts with him causing violence or doing violence against" the victim.

During the current incident, the officer asked defendant about the restraining order; defendant said he was aware of it and its conditions; he knew "that he was supposed to stay away from" the victim. Upon the People's motion, the court admitted into evidence certified copies of the criminal protective order and defendant's rap sheet.

4

A defense witness testified that defendant had been actively working in their church and helping people: "I would say he's a peaceful person and I would say he promote[s] peace and unity and he [has] always been pleasant for me to be around and others in the congregation. We have a fairly large congregation and out of the people in our congregation, I've never—he's been around my wife, my daughter, my children, and I've never known him to be a violent person." Doctors had implanted a steel plate in defendant's head after he had fallen out of a tree seven or eight years earlier.

The court found defendant in violation of his probation. The People argued the court should sentence defendant to the aggravated term of four years of imprisonment due to his long criminal history and poor performance on parole and probation, which they asserted were supported by the certified copy of his rap sheet. Defense counsel argued the court should sentence defendant to the low term due to that facts that "he sustained a traumatic brain injury[;]" cared for his sick, 86-year-old mother; and "volunteers his time at the church[.]" The People responded that there "was no testimony that he suffered a traumatic brain injury."

The court sentenced defendant to the upper term of four years. "That is based on my review of the rap sheet, his criminal history. I will note that according to the rap sheet, it appears that he's been sentenced to prison four times. He's had multiple parole violations. He's been placed on probation, violated probation, at least in the one instance, that resulted in a prison sentence. There have been multiple attempts at rehabilitation which have appeared not to be successful."

"I also don't find any mitigating factors. I am sympathetic to his traumatic brain injury. I don't have any doubt based on the report that [defendant] has suffered that. But my sentence is based on his prior history and . . . were this [] happening at the time of the original sentencing, I think these factors would have supported that aggravated term." "I would also note that while he did volunteer at church very often, it appears as though those instances of church volunteering also included ongoing violations of his probation and the criminal protective order. So while I do applaud and encourage any involvement in community activities such as volunteering at church, in this particular instance it came with, there's a thorn among the roses."

## II. DISCUSSION

Defendant contends the court abused its discretion by imposing the upper term based on one aggravating factor. We disagree.

"We review a trial court's sentencing decisions for an abuse of discretion, evaluating whether the court exercised its discretion 'in a manner that is not arbitrary and capricious, that is consistent with the letter and spirit of the law, and that is based upon an "individualized consideration of the offense, the offender, and the public interest." ' [Citation.]" (*People v. Panozo* (2021) 59 Cal.App.5th 825, 837.)

" 'To prove an abuse of discretion, " '[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a

particular sentence will not be set aside on review.' " [Citation.] To meet this burden, the defendant must "affirmatively demonstrate that the trial court misunderstood its sentencing discretion." ' [Citation.] ' "Defendants are entitled to sentencing decisions made in the exercise of the 'informed discretion' of the sentencing court. [Citations.] A court which is unaware of the scope of its discretionary powers can no more exercise that 'informed discretion' than one whose sentence is or may have been based on misinformation regarding a material aspect of a defendant's record." ' [Citation.]" (*People v. Fredrickson* (2023) 90 Cal.App.5th 984, 988; accord *People v. Lopez* (2022) 78 Cal.App.5th 459, 466-467 (*Lopez*).)

"Before Senate Bill [No.] 567 amended sections 1170 and 1170.1 effective January 1, 2022, if a statute prescribed a sentencing triad for a conviction or an enhancement, the court had discretion to choose any one of the three terms. [Citations.] Section 1170 now provides that the upper term shall be imposed 'only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term' [citation] and the circumstances are (1) stipulated to by the defendant, (2) found true by the trier of fact beyond a reasonable doubt, or (3) based on prior convictions evidenced by a certified record of conviction [citation]." (*People v. Butler* (2023) 89 Cal.App.5th 953, 958.)

"Pursuant to subdivision (b)(3) of section 1170, a trial court 'may consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury.' " (*Lopez, supra*, 78 Cal.App.5th at p. 466.) "[U]nquestionably the trial court may still rely on any single permissible aggravating factor to select an upper term sentence under the newly revised triad system." (*Id*. at p. 467; accord *People v. Flores* (2022) 75 Cal.App.5th 495, 500-501 (*Flores*) [imposition of upper term supported by defendant's prior criminal history and poor performance on probation].)

Here, the court considered all the relevant factors submitted to it when choosing to which term it sentenced defendant. The court considered defendant's traumatic brain injury, his care of his mother, and his volunteer service in the church. However, the court found that defendant's criminal record, as supported by the certified criminal rap sheet, supported imposition of the upper term of imprisonment. The court's ruling finds ample support in the record.

Exhibit two, the copy of defendant's certified rap sheet, which the court admitted into evidence at the hearing, reflects that defendant had incurred more than half a dozen prior convictions for controlled substance related offenses; multiple prior convictions for trespass, petty theft, and failures to appear; and additional prior convictions for battery and taking a vehicle. Courts had sentenced defendant to prison on multiple occasions. Defendant had violated the terms of his parole on six occasions. The court's selection of the upper term of imprisonment was not arbitrary or capricious.

Defendant relies on Justice Liu's concurring opinion in *Flores* for the proposition that courts may no longer impose the upper term based on one aggravating circumstance. (*Flores*, *supra*, 75 Cal.App.5th at pp. 500-501 (conc. opn. of Liu, J.).) However, Justice Liu only observed, "it *may* no longer be true that 'the existence of a single aggravating circumstance is legally sufficient to make the defendant eligible for the upper term.' [Citation.] Instead, it appears a defendant is subject to an upper term sentence only if the aggravating circumstances are sufficient to 'justify the imposition' of that term under all of the circumstances, which may include evidence both in aggravation and in mitigation. [Citations.]" (*Ibid*., italics added.)

Moreover, the court here did consider all the circumstances, as noted *ante*, when imposing sentence. Furthermore, "[a] concurrence is not the opinion of the court and is not binding." (*Duran v. U.S. Bank National Assn.* (2018) 19 Cal.App.5th 630, 644, fn. 9.)

Although the court did not expressly mention Senate Bill No. 567's amendment of the sentencing statute, the court imposed sentence several months after those changes went into effect. We presume the court understood its sentencing discretion. Defendant has failed his burden to demonstrate otherwise. (*Fredrickson*, *supra*, 90 Cal.App.5th at p. 988.) Thus, the court acted within its discretion in imposing the upper term.

## III.  DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

<u>McKINSTER            </u>
                                                    J.

We concur:

<u>RAMIREZ            </u>
            P. J.

<u>RAPHAEL            </u>
            J.

10