Filed 7/12/22 Certified for Publication 8/5/22 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| DONNA FISHER, | |
| Plaintiff and Appellant, | G060021 |
| v. | (Super. Ct. No. 30-2017-00941574) |
| COUNTY OF ORANGE, | O P I N I O N |
| Defendant and Respondent. | |

Appeal from a judgment of the Superior Court of Orange County, Thomas A. Delaney and Stephanie George, Judges. Affirmed. Request for judicial notice. Granted in part and denied in part.

Law Offices of Robert A. Pool and Robert A. Pool for Plaintiff and Appellant.

Leon J. Page, County Counsel, and D. Kevin Dunn, Deputy County Counsel, for Defendant and Respondent.

\* \* \*

## INTRODUCTION

Donna Fisher resides in a mobilehome situated in The Groves mobilehome residential community in Irvine, California. In 2011, Fisher filed a verified assessment appeal application with the Assessment Appeals Board No. 3 (the Board) for the County of Orange (the County). Fisher contested the County Assessor's assessment of the value of the land upon which her mobilehome was sitting for the 2011-2012 fiscal year, arguing that the property had suffered a decline in value. Following extensive hearings, the Board issued its findings of fact and determination denying Fisher's application.

Fisher filed a lawsuit against the County in the superior court in which she challenged the Board's decision and sought a refund for overpayment of taxes in the amount of $739 for the underlying real property of her mobilehome. Following trial, the trial court issued a statement of decision rejecting Fisher's challenges to the Board's findings of fact and determination and entered judgment in favor of the County.

Fisher contends the judgment should be reversed because (1) the trial court erred in concluding she had filed her lawsuit against the wrong party; (2) the assessor had erroneously applied the so-called "extraction method" of assessment; (3) Fisher was a month-to-month lessee of the land upon which her mobilehome was sitting and thus under Revenue and Taxation Code section 60,[1] would not be subject to assessment under section 62.1, subdivision (b) (section 62.1(b)); (4) the Board had improperly placed the burden of proof on Fisher in violation of section 167; and (5) the assessor had not been granted permission to make individual assessments at The Groves within the meaning of section 2188.10, subdivision (c)(1).

We affirm. As explained by the California Supreme Court in *Holland v. Assessment Appeals Bd. No. 1* (2014) 58 Cal.4th 482, 495 (*Holland*), use of the extraction method of assessment of mobilehome properties, as was applied by the assessor in the

---

[1] All further statutory references are to the Revenue and Taxation Code unless otherwise specified.

2

instant case, is not foreclosed by section 62.1(b). In *Holland*, the Supreme Court further explained that "we owe a degree of deference" to the State Board of Equalization's (SBE) interpretation of section 62.1(b), noting that, in an advisory letter, the SBE concluded the extraction method was the "most reasonable way of allocating the value" between the mobilehome and the underlying fractional interest in a mobilehome park. (*Holland*, at pp. 488, 494.)

We reject Fisher's other contentions of error for the reasons we discuss *post*.

## FACTS AND PROCEDURAL HISTORY

## I.

### FISHER FILED AN ASSESSMENT APPEAL APPLICATION WITH THE BOARD

In 1986, Fisher "first took up residence" in a mobilehome located on a particular space within The Groves through her purchase of her mobilehome for the price of $80,000.[2] At the time, The Groves was not a resident-owned mobilehome park, so Fisher did not have a taxable land interest and instead paid rent for the use of the space upon which the coach was located, as well as the use of the community land and facilities within The Groves. After The Groves converted to a resident-owned mobilehome park, in 2006, Fisher purchased a share in The Groves corporation for $84,000. The County's assessor "did not recognize the share price as representing the value of the land, and established a base year value of $290,000."

Several years later, in September 2011, Fisher filed with the Board a verified application for assessment reduction under section 1603 to contest the Fisher real property assessment (the application). The application asserted the property had suffered a decline in value, the property's then base year value was incorrect, and the assessor had

---

[2] We refer to the real property upon which Fisher's mobilehome was sitting as the "Fisher real property," and we refer to Fisher's mobilehome as "the coach."

3

used an incorrect methodology of determining the base year value of the property. Fisher's "opinion for the decline in value of the subject property [was] $86,180 for the land and $10,820 for improvements [the coach itself], for a total value of $97,000. With the decline in value, the Assessor's enrolled value for the subject property [was] $160,053 for the land and $10,820 for improvements, for a total value of $170,873." The principal issue was for the Board to determine the fair market value of the Fisher real property and the coach as of the lien date of January 1, 2012.

Over the course of two and a half years, the Board held seven days of hearings at which oral testimony and over 100 combined exhibits were presented.[3] The Board took the matter under submission, deliberated in closed session, and on February 15, 2017, issued its findings of fact and determination on the application.

In its findings of fact and determination, the Board rejected Fisher's challenges to the assessor's use of the extraction method for assessing the value of the Fisher real property, property which is considered taxable by the assessor. The Board sustained the enrolled value of $170,873 for the property, with $160,053 allocated to the land and $10,820 allocated to the improvements.

## II.

### FISHER FILED THE INSTANT LAWSUIT IN SUPERIOR COURT CHALLENGING THE BOARD'S DECISION AND SEEKING A REFUND OF PROPERTY TAXES.

In 2017, Fisher initiated the instant trial court action against the County. In 2018, Fisher filed the operative complaint against the County, styled as the fourth amended complaint for refund of property taxes (§ 5140) and for attorney fees (Gov.

---

[3] The appellate record does not include the administrative record. We do not have any oral transcripts from the Board's hearings or a complete set of the documentary evidence offered at those hearings. Neither did the trial court. Instead, our record includes exhibits attached to Fisher's trial brief and request for judicial notice filed in the superior court.

Code, § 800) (the complaint). The following summarizes the allegations of the complaint.

Fisher does not own a fee simple interest, or the substantial equivalent, in the Fisher real property. Instead, The Groves Homeowners, Inc. (GHI), a California domestic nonprofit corporation, is the fee simple owner of The Groves, including the Fisher real property.

The complaint alleged the County's assessor, in making assessments for the County's 2011-2012 fiscal year, erroneously determined that the full cash value of the Fisher real property was nearly $170,873 as of January 1, 2011 (the valuation date).

Fisher asserted the full cash value of the Fisher real property did not exceed $97,000 as of the valuation date. Therefore, she alleged, the value of the Fisher real property was over assessed in the amount of $73,873 (the difference of $170,873 and $97,000), which resulted in an excessive levy of taxes on the Fisher real property in the approximate amount of $739 for County's 2011-2012 fiscal year.

Fisher alleged she paid in full all property taxes levied under the Fisher real property assessment for the County's 2011-2012 fiscal year to the County's tax collector. She thereafter filed the application which, as described *ante*, the Board denied.

In her complaint, Fisher asserted that, in denying the application, the Board had acted in an arbitrary and capricious manner because it endorsed the assessor's use of "the so-called 'Extraction Method'" in assessing the value of the Fisher real property in disregard of the holding of *Holland, supra*, 58 Cal.4th 482 that section 62.1(b) does not establish an assessment methodology.

Fisher sought to recover from the County a refund in the amount of $739 in overpaid tax for the Fisher real property, prejudgment interest, and attorney fees under Government Code section 800.

5

## III.

### FOLLOWING TRIAL, THE TRIAL COURT ENTERED JUDGMENT AGAINST FISHER.

Trial on Fisher's property tax refund action was completed in one day. The parties submitted evidence and offered argument and posttrial briefing. The trial court issued a statement of decision reiterating the Board's findings.

The trial court concluded Fisher had failed to state a claim against the County because under section 4808, any action alleging an illegal or unconstitutional method of valuation must name the assessor or the auditor-controller as the defendant and not the county itself in which the subject property is located. Here, Fisher named the County as the sole defendant in this case.

On the merits, the trial court determined: "With respect to the extraction method itself, the Court finds that the extraction method, as employed by the Assessor here, is not foreclosed by Revenue & Taxation Code section 62.1. [Fisher]'s argument would have greater weight if there were code sections or cases that expressly disallowed the extraction method. However, those Code sections and cases do not exist, [Fisher]'s contentions that the extraction method does not conform to Revenue and Taxation Code section 110 and other Code sections notwithstanding. What is clear is that the California Supreme Court held that the extraction method does not violate Section 62.1, the principal code section governing the type of mobile home parks that includes the Groves, and that the SBE clearly endorses the use of the extraction method, both in the LTAs and in the Assessor's Handbook. The Court finds that use of the extraction method is permitted under California law, with authority derived from the *Holland* decision and the SBE, specifically LTA 99/87, whose expertise on these matters was recognized and supported by the *Holland* court." The court explained why it declined to follow Fisher's proposed alternative assessment methodology and otherwise rejected her other arguments.

6

The trial court's statement of decision concluded: "The Court cannot find for [Fisher] on the facts and law presented to the Court. Accordingly, the Court denies the relief requested by [Fisher] in the operative Complaint, and the Court affirms the finding of the [Board] in Assessment Appeal Application No. 11-011616."

Judgment was entered in favor of the County and against Fisher. Fisher appealed.

**REQUEST FOR JUDICIAL NOTICE**

Fisher has filed a motion for judicial notice requesting that this court take judicial notice of portions of legislative history of section 62.1 and the 1999 advisory letter issued by the SBE to assessors (SBE Letter No. 99/87, Individual Transfers in Resident-Owned Mobilehome Parks (Dec. 31, 1999) (LTA No. 99/87)). The County has not filed opposition to the request. Fisher's request is granted. (See Evid. Code, §§ 452, subd. (c) [judicial notice may be taken of "[o]fficial acts of the legislative, executive, and judicial departments of . . . any state of the United States"]; 459, subd. (a); *Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 279, fn. 9 [legislative history indisputably proper subject of judicial notice]; *Mooney v. County of Orange* (2013) 212 Cal.App.4th 865, 872.)

Fisher also requests that we take judicial notice of a "generic GHI Certificate of Membership," which had not been offered as evidence to either the Board at the assessment appeal hearing or to the trial court in the instant action. Fisher argues judicial notice of this document may be taken pursuant to Evidence Code section 452, subdivision (h) because it falls within the category of that subdivision: "Facts and propositions that are not reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy."

We deny Fisher's request for judicial notice of the GHI certificate of membership. That document does not fall within the scope of Evidence Code section

452, subdivision (h). Furthermore, the document is not relevant to the resolution of the issues presented in this appeal.

## DISCUSSION

### I.

### OVERVIEW OF GOVERNING LEGAL PRINCIPLES AND STANDARD OF REVIEW

"In California all real property and business personal property is taxable 'in proportion to its full value' unless specifically exempted. (Cal. Const., art. XIII, § 1, subd. (b).)" (*County of Los Angeles v. Raytheon Co.* (2008) 159 Cal.App.4th 27, 34 (*Raytheon*).) "In 1978, Proposition 13 amended the California Constitution to limit real property taxes to [one] percent of a property's base year value adjusted annually by an inflation factor not to exceed [two] percent of the prior year's value. (Cal. Const., art. XIII A, §§ 1, subd. (a), 2, subd. (b); [citations].) Proposition 13 set the base year value used to determine each year's taxes at the value the local assessor set on the 1975-1976 tax bill. [Citation.] A property's base year value may be reestablished only if the property is purchased, is newly constructed, or there is a change in ownership." (*William Jefferson & Co., Inc. v. Orange County Assessment Appeals Bd. No. 2* (2014) 228 Cal.App.4th 1, 9 (*William Jefferson*).)

"Proposition 8, passed by the voters in 1978, provides for a temporary reduction in assessed value based on a decline in value. (Cal. Const., art. XIII A, § 2, subd. (b); [citations].)" (*Little v. Los Angeles County Assessment Appeals Bds.* (2007) 155 Cal.App.4th 915, 918, fn. 2.) Article XIII A, section 2, subdivision (b) of the California Constitution provides: "The full cash value base may reflect from year to year the inflationary rate not to exceed [two] percent for any given year or reduction as shown in the consumer price index or comparable data for the area under taxing jurisdiction, *or*

8

*may be reduced to reflect* substantial damage, destruction, or other *factors causing a decline in value*."[4]  (Italics added.)

"'Under the California Constitution, article XIII A, section 1, subdivision (a), a county assessor must determine a base year value for property when it changes ownership, that is, the "full cash value" or "fair market value" of the property.  (§ 110.1, subd. (b).)  "For purposes of determining the 'full cash value' or 'fair market value' of real property . . . 'full cash value' or 'fair market value' is the purchase price paid in the transaction unless it is established by a preponderance of the evidence that the real property would not have transferred for that purchase price in an open market transaction.  The purchase price shall, however, be rebuttably presumed to be the 'full cash value' or 'fair market value' if the terms of the transaction were negotiated at arms length between a knowledgeable transferor and transferee neither of which could take advantage of the exigencies of the other . . . ."  (§ 110, subd. (b).)  "[A]fter a property's base year value is determined, subsequent entries onto the assessment rolls [generally] are done pro forma without the need to exercise one's judgment as to value, simply by applying an inflation factor to the previous year's entry."'"  (*Little v. Los Angeles County Assessment Appeals Bds., supra*, 155 Cal.App.4th at p. 918, fn. 1.)

"Administration of this constitutionally mandated real and personal property tax is governed by statutes enacted by the Legislature (see, e.g., Rev. & Tax.

---

[4]  Section 51, subdivision (a) provides:  "For purposes of subdivision (b) of Section 2 of Article XIII A of the California Constitution, for each lien date after the lien date in which the base year value is determined pursuant to Section 110.1, the taxable value of real property shall, except as otherwise provided in subdivision (b) or (c), *be the lesser of*: [¶] (1) Its base year value, compounded annually since the base year by an inflation factor, [determined in subparts (A) through (D) not at issue here] [and] (2) Its full cash value, as defined in Section 110, as of the lien date, *taking into account reductions in value* due to damage, destruction, depreciation, obsolescence, removal of property, or other factors causing a decline in value."  (Italics added.)

Code, §§ 50-5911) and regulations promulgated by the State Board of Equalization (see, e.g., Cal. Code Regs., tit. 18, §§ 1-1051)." (*Raytheon, supra*, 159 Cal.App.4th at p. 34.)

"In accordance with the governing statutes and administrative regulations, each year each county assessor is required, on or before July 1, to compile and index the property tax roll, a list of taxable real and personal property located in the county and their assessed values. [Citations.] A taxpayer who wishes to challenge the assessment has two possible administrative remedies: The taxpayer may 'petition the board for a reduction in an assessment' pursuant to section 1603 (§ 1604, subd. (b)(1)); alternatively, or sometimes in addition to a section 1603 application for a reduction in assessment, the taxpayer may file a claim for tax refund pursuant to section 5097." (*Raytheon, supra*, 159 Cal.App.4th at p. 35.) "A property owner must exhaust this administrative appeals process before seeking judicial relief, and the failure to do so will result in dismissal of the property owner's lawsuit." (*William Jefferson, supra*, 228 Cal.App.4th at p. 10.)

After a property owner initiates the appeals process by filing a written application to change the assessment with the local assessment appeals board, the local board must conduct a public hearing to receive evidence and decide the appeal. (*William Jefferson, supra*, 228 Cal.App.4th at p. 9.)[5] "Although a local assessment appeals board decision arises from an administrative hearing process, the mechanism for seeking judicial review of the decision '"is significantly different from that of other administrative agency decisions. Ordinarily the aggrieved taxpayer's remedy is not to seek administrative mandate pursuant to Code of Civil Procedure section 1094.5, but to

---

[5] The appellate court in *William Jefferson, supra*, 228 Cal.App.4th at page 10 cautioned: "A property owner must be aware of the distinction between a successful application that reduces a base year value and the property owner's right to a refund of any excess taxes paid based on the erroneous base year value: '["]The base-year value is a control figure from which an assessment is determined. The correction of the base-year value allows the assessor to determine whether there has been an overassessment or an underassessment. Thereafter, an application must be made for a refund.'"'"

10

pay the tax and file suit in superior court for a refund. [Citations.]" [Citation.]'
[Citation.] Indeed, '[t]he exclusive means of review of tax proceedings in California has
been the remedy of suit to recover alleged overpayments, and the power of the state to
provide such suit as the exclusive remedy is unquestioned.'" (*William Jefferson, supra*,
228 Cal.App.4th at pp. 10-11.)[6]

A county assessment appeals board has "'semijudicial status'" because it is
"""a constitutional agency exercising quasi-judicial powers delegated to the agency by
the Constitution."""" (*Manson Construction Co. v. County of Contra Costa* (2020)
56 Cal.App.5th 1079, 1087.) Such a board's """"factual determinations are entitled on
appeal to the same deference due a judicial decision, i.e., review under the substantial
evidence standard." [Citation.]' [Citation.] When the assessment appeals board decides
a question of law, such as the interpretation of a statute, courts are authorized to conduct
an independent reassessment. [Citation.] In reviewing a property tax assessment,
however, the court presumes the assessor's office properly performed its duty and that the
assessment was both regularly and correctly made." (*Ibid.*; see *Farr v. County of Nevada*
(2010) 187 Cal.App.4th 669, 679 [assessment appeals board is """"a constitutional
agency exercising quasi-judicial powers delegated to the agency by the Constitution'
[citation] with 'special expertise in property valuation'"""].) """"A board's 'arbitrariness,
abuse of discretion, or failure to follow the standards prescribed by the Legislature' are
legal matters subject to judicial correction."""" (*Farr, supra*, 187 Cal.App.4th 669, 679-
680; see *Sunrise Retirement Villa v. Dear* (1997) 58 Cal.App.4th 948, 955-956 ["To
allow the parties to challenge every administrative decision with another trial de novo

---

[6] "Because a tax refund action provides property owners with an adequate remedy at law,
equitable actions for mandamus, injunctive, and declaratory relief generally are
unavailable to obtain judicial review of a local assessment appeals board decision."
(*William Jefferson, supra*, 228 Cal.App.4th at p. 11.)

11

would be a waste of both administrative and judicial resources, and the administrative hearings would be nothing more than perfunctory gestures'"].)

## II.

### THE TRIAL COURT'S FINDING FISHER SUED THE WRONG PARTY IN THIS ACTION

In her opening brief, Fisher argues the trial court erred by concluding the complaint failed to state a claim against the County on the ground section 4808 required this action to have been brought against the County's assessor and/or the County's auditor-controller instead.[7] Section 4808 provides in relevant part: "Any action alleging an illegal or unconstitutional method of valuation or similar matter shall name as respondent the assessor of the county in which the property is located. An action alleging an unconstitutional or illegal tax rate shall name as respondent the auditor-controller of such county."

Fisher argues she brought this action seeking a refund of property taxes under section 5140, and therefore properly named the County as the defendant. Section 5140 provides in part: "The person who paid the tax . . . may bring an action only in the superior court, but not in the small claims division of the superior court, *against a county* or a city to recover a tax which the board of supervisors of the county or the city council of the city has refused to refund on a claim filed pursuant to Article 1 (commencing with Section 5096) of this chapter." (Italics added; see *William Jefferson, supra*, 228 Cal.App.4th at p. 6 ["any lawsuit that seeks a property tax reduction by challenging the base year value assigned to an owner's property must be brought as a tax refund action against the county or city that collected the tax"].)

---

[7] In its respondent's brief, the County argues we should dismiss this appeal because Fisher had failed to name the assessor and auditor-controller as defendants in the complaint in violation of section 4808. The County did not, however, file a motion to dismiss the appeal or otherwise comply with rule 8.54 of the California Rules of Court in support of its dismissal request. Furthermore, there is no legal basis for dismissing this appeal on the ground asserted by the County.

Fisher's operative complaint is entitled "fourth amended complaint for refund of property taxes [Rev. & Tax. Code, § 5140]." (Boldface and some capitalization omitted.) The body of that complaint stated the Board endorsed the wrong assessment methodology in evaluating whether Fisher was entitled to a refund and, in the prayer of the complaint, Fisher sought a refund for the overpaid tax on the Fisher real property in the amount of $739.

In the statement of decision, the trial court concluded Fisher failed to name proper parties as defendants. There is no question the relief Fisher sought in the complaint was based on her contention that the assessor's use of the extraction method in assessing the value of the Fisher real property was contrary to law. It is therefore logical that such a complaint would be construed as an "action alleging an illegal or unconstitutional method of valuation" within the meaning of section 4808.

Other than citing section 4808 itself, the parties do not cite any legal authority addressing whether under the circumstances of this case, the County's assessor and/or auditor-controller were necessary parties to include in this action in addition to or in the place of the County. We do not need to resolve this issue because, in any event, and for the reasons we explain *post*, the trial court did not err by entering judgment in favor of the County on the merits of the complaint.

### III.

**THE TRIAL COURT DID NOT ERR BY AFFIRMING THE ASSESSOR'S METHOD OF DETERMINING THE FAIR MARKET VALUE OF THE FISHER REAL PROPERTY**

In her opening brief, Fisher argues that both the Board and the trial court erred by affirming the assessor's use of the extraction method to assess the value of the Fisher real property, which method, Fisher argues, violated section 62.1(b). For the reasons we will explain, we find no error.

13

A.

*Section 62.1*

As discussed *ante*, passage of Proposition 13 effected an amendment to the California Constitution limiting "the rate at which real property in this state may be taxed and the extent to which the assessed value of real property may be increased." (*Holland, supra*, 58 Cal.4th at p. 485.) As so amended, the Constitution provides that "real property may be taxed at no more than [one] percent of its 'full cash value,' with 'full cash value' defined to mean either the assessed value of that property in the 1975-1976 tax year or the property's value at the time of a subsequent 'change in ownership,' subject to an adjustment for inflation" (*ibid*.) or an adjustment for a decline in value (Cal. Const., art. XIII A, § 2, subd. (b)).

In 1985, the Legislature passed section 62.1 intending to encourage a particular form of organization for mobilehome parks. Section 62.1, subdivision (a)(1) provides in part that a "transfer . . . of a mobilehome park to a nonprofit corporation, stock cooperative corporation, limited equity stock cooperative, or other entity formed by the tenants of a mobilehome park, for the purpose of purchasing the mobilehome park" is deemed not to be a change in ownership of the park. (See *Holland, supra*, 58 Cal.4th at p. 486.) Thus, section 62.1, subdivision (a)(1) allows the residents of a mobilehome park to form a nonprofit corporation or similar entity to take ownership of the park without triggering reassessment. (*Ibid.*)[8]

In 1988, the Legislature introduced legislation with the intent, in part, of addressing a problem that had emerged in the tax treatment of mobilehome parks: Under the then current version of section 62.1, "[t]ransfers of interests in mobilehome parks

---

[8] Section 62.1, subdivision (c) provides: "It is the intent of the Legislature that, in order to facilitate affordable conversions of mobilehome parks to tenant ownership, paragraph (1) of subdivision (a) apply to all bona fide transfers of rental mobilehome parks to tenant ownership, including, but not limited to, those parks converted to tenant ownership as a nonprofit corporation made on or after January 1, 1985."

14

held by a nonprofit corporation, unlike those held by a condominium or stock cooperative, did not constitute a change in ownership under the Revenue and Taxation Code." (*Holland, supra*, 58 Cal.4th at p. 486.) "Therefore, once a mobilehome park was purchased by a nonprofit corporation or similar entity, subsequent transfers of membership shares were not subject to reassessment." (*Ibid.*) "As explained in an analysis of Senate Bill No. 1885 prepared by the state Board of Equalization (SBE), '[p]utting a park into a nonprofit mutual benefit corporation ownership could mean that no part of the park would ever be reappraised again, since transfers of individual interests in a nonprofit corporation do not trigger reappraisal. This would give mobilehome parks much more favorable treatment than the average homeowner.'" (*Ibid.*)

The Legislature amended section 62.1 to create "a rule to facilitate what it viewed as equitable tax treatment of these property interests" in subdivision (b)(1) to provide that, "[w]here a mobilehome park has been purchased by a nonprofit corporation or similar entity, any subsequent transfers 'of shares of the voting stock of, or other ownership or membership interests in, the entity that acquired the park . . . shall be a change in ownership of *a pro rata portion of the real property* of the park.'" (*Holland, supra*, 58 Cal.4th at p. 486, quoting section 62.1, subd. (b)(1), italics added.) Section 62.1, subdivision (b)(2) defines the term "'pro rata portion of the real property'" as "the total real property of the mobilehome park multiplied by a fraction consisting of the number of shares of voting stock, or other ownership or membership interests, transferred divided by the total number of outstanding issued or unissued shares of voting stock of, or other ownership or membership interests in, the entity that acquired the park . . . ." As amended, section 62.1(b) provides that "no change of ownership occurs when the residents of a mobilehome park form a nonprofit corporation or similar entity that purchases the park. But if one of the residents subsequently transfers his or her interest in the entity that owns the park, that transfer will constitute a change in ownership of a 'pro rata portion' of the park." (*Holland, supra*, at pp. 486-487.)

15

B.

Holland, supra, *58 Cal.4th 482*

In the seminal case of *Holland, supra*, 58 Cal.4th 482, the question presented was whether section 62.1(b) mandates any particular formula for appraising mobilehomes and the real property upon which they sit. (*Holland, supra*, 58 Cal.4th at p. 487.) The Supreme Court answered this question in the negative, concluding that section 62.1(b) "simply describes a unit of real property that is subject to reassessment; it does not mandate any particular formula for appraising this unit." (*Holland, supra*, at p. 487.)

In *Holland, supra*, 58 Cal.4th at page 487, the assessor for the County of Santa Barbara had "reassessed 26 subsequent transfers of individual interests in two mobilehome parks held by resident-controlled nonprofit corporations after certain residents sold both their mobilehomes and their interests in the corporation. The mobilehomes themselves, which are classified as personal property, were assessed separately." (*Ibid.*; see §§ 5801, 5810.) Following the guidance of the SBE, and in particular LTA No. 99/87, the assessor appraised the real property interest subject to reassessment — i.e., a fraction of the mobilehome park itself — using the so-called "extraction method." (*Holland, supra*, at p. 487.) According to LTA No. 99/87, the "'most reasonable way of allocating the value' between the mobilehome and the underlying fractional interest in the park was to employ what has been termed the extraction method: '(1) extract from the reported purchase price the value of the mobilehome itself, using the N.A.D.A. Manufactured Housing Appraisal Guide or another recognized value guide, and then (2) assign the remainder of the purchase price to the interest in the park.'" (*Holland, supra*, at p. 488.)

In *Holland, supra*, 58 Cal.4th at page 488, the Santa Barbara County Assessment Appeals Board No. 1 (Appeal Board), after holding extensive hearings, determined the assessor's use of the extraction method of appraisal set forth in LTA No.

99/87 was inconsistent with section 62.1(b). The Appeal Board concluded that section 62.1(b) prescribed the following formula for appraising a portion of the park that was subject to reassessment: "'Fractional Interest x [Fair Market Value] of Entire Real Property of Park = [Fair Market Value] of Fractional Interest.'" (*Ibid.*) The assessor for the County of Santa Barbara filed a petition for writ of mandate challenging the Appeal Board's conclusion. (*Id.* at p. 489.) The trial court denied the petition and a divided Court of Appeal affirmed. (*Ibid.*)

The Supreme Court reversed the judgment of the Court of Appeal. (*Holland, supra*, 58 Cal.4th at p. 495.) The *Holland* court explained that section 62.1(b) simply defines a unit of property that is deemed to change ownership for assessment purposes and does not compel an assessor to appraise fractional interests in resident-owned mobilehome parks using the formula adopted by the Appeal Board. (*Holland, supra*, at p. 489.) The *Holland* court stated that the plain meaning of the text of section 62.1(b) "offers little support for the Appeal Board's interpretation" as the use of the term "pro rata" in that statute "simply means '[p]roportionately.'" (*Id.* at p. 490.) The court further stated that "[t]here is no indication in the legislative history that section 62.1(b) was intended to do anything beyond that what was necessary to close [the] loophole" for mobilehome parks that was created with the enactment of section 62.1, subdivision (a). (*Id.* at pp. 491-492.)

The Supreme Court also stated: "A final reason for concluding that section 62.1(b) does not mandate the valuation formula adopted by the Appeal Board is that we owe a degree of deference to the SBE's interpretation of the statute, even though that interpretation is embodied only in an informal advice letter to the county assessors. [Citations.] Such deference is warranted because 'the agency will often be interpreting a statute within its administrative jurisdiction . . . [and] may possess special familiarity with satellite legal and regulatory issues.' [Citation.] The degree to which 'judicial deference to an agency's interpretation is appropriate . . . is . . . fundamentally *situational*' and will

17

depend on the extent to which the agency's expertise will provide it with a "'comparative interpretative advantage over the courts'" and the degree to which it appears that the agency has carefully considered the issue. [Citations.] [¶] The SBE undoubtedly has expertise in property tax matters. [Citations.] Moreover, the SBE might be expected to have particular familiarity with the provision at issue here because the SBE sponsored its passage." (*Holland, supra*, 58 Cal.4th at p. 494.) The Supreme Court further stated that the SBE's consistency in interpreting section 62.1(b) as simply defining a unit of property subject to assessment and as not mandating any particular appraisal formula, "further confirms our conclusion that section 62.1(b) does not mandate any particular appraisal formula." (*Id.* at p. 495.)

The Supreme Court ultimately held that "the Court of Appeal erred in concluding that section 62.1(b) establishes a particular formula for appraising the fraction of real property that is deemed to change ownership upon transfer of an interest in the resident-owned entity that owns a mobilehome park." (*Holland, supra*, 58 Cal.4th at p. 495.) The court stated that "[i]n reaching this conclusion, we make no judgment as to the proper means of appraising these property interests. We hold only that the extraction method of appraisal is not foreclosed by section 62.1(b)." (*Ibid.*) The Supreme Court reversed the judgment of the Court of Appeal and remanded for further proceedings consistent with its opinion. (*Ibid.*)

C.

*Fisher's Argument that the Assessor's Use of the Extraction Method Here Violated Section 62.1(b) Is Without Merit.*

Fisher argues the "'extraction' method of assessment, under LTA No. 99/87, violates . . . Section 62.1(b)." (Boldface omitted.) In support of her argument, Fisher emphasizes the *Holland* court's limited holding that the extraction method of appraisal "'is not foreclosed by'" section 62.1(b). (*Holland, supra*, 58 Cal.4th at p. 495.)

18

As discussed *ante*, the Supreme Court concluded that section 62.1(b) simply describes a unit of real property that is subject to reassessment and does not mandate any particular formula for appraising such a unit; no other statute or regulation mandates a particular formula for appraising such a unit either. In the absence of statutory or regulatory mandate on the subject, the Supreme Court stated that "we owe a degree of deference to the SBE's interpretation of the statute, even though that interpretation is embodied only in an informal advice letter to the county assessors," given its expertise in property tax matters. (*Holland, supra*, 58 Cal.4th at p. 494.) The Supreme Court observed that in LTA No. 99/87, the SBE concluded that the extraction method is the "'most reasonable way of allocating the value' between the mobilehome and the underlying fractional interest in the park." (*Id.* at pp. 487-488.)

In her opening brief, Fisher heavily relies on Justice Werdegar's concurring opinion in *Holland*, which was not joined by the other justices, which stated: "I greatly doubt the alternative appraisal formula recommended by the state Board of Equalization (SBE) and used by the assessor, the so-called extraction method [citation] is consistent with either the language or the intent of section 62.1, subdivision (b)." (*Holland, supra*, 58 Cal.4th at p. 496 (conc. opn. of Werdegar, J.).) If the extraction method is inconsistent with the language and intent of section 62.1(b), it logically follows use of that method would not be permitted under that code section. Justice Werdegar's statement in the concurring opinion therefore conflicts with the majority opinion's holding that the extraction method is not foreclosed by section 62.1(b).

In any event, "[a] concurrence is not the opinion of the court and is not binding." (*Duran v. U.S. Bank National Assn.* (2018) 19 Cal.App.5th 630, 644, fn. 9; see *People v. Retanan* (2007) 154 Cal.App.4th 1219, 1231 ["'"[N]o opinion has value as a precedent on points as to which there is no agreement of a majority of the court,"'" and further noting that when no other justice has joined in a concurring opinion, "[the] concurring opinion . . . has no precedential value"].)

19

We do not conclude that the extraction method is automatically the method of assessment to be used in all cases. As neither the Legislature nor the Supreme Court has made such a pronouncement, nor do we. Fisher does not explain how, under the specific circumstances of the case presented here, application of the extraction method would be inappropriate. We note that Fisher does not argue that the assessor's application of the extraction method here was in and of itself improperly conducted. We therefore find no error arising from the assessor's use or application of the extraction method in this case.

## IV.

### VALUE EQUIVALENCE UNDER SECTION 60

In her opening brief, Fisher argues that because her membership in GHI created "a short-term lease of 1/533 part" of The Groves (533 being the number of membership shares she contends were sold or available for sale at The Groves), the resulting leasehold "plainly cannot meet the Value Equivalence element" of section 60. She further argues a question arises whether those circumstances are nevertheless overridden by section 62.1(b)(1). She argues "[t]his appeal calls for the Court of Appeal squarely and independently to address and resolve the apparent dichotomy of . . . Sections 60 and 62.1(b)(1) on the facts presented."

As discussed *ante*, taxation and reassessment in California are often triggered by a change in ownership of real property. According to the Supreme Court in *Pacific Southwest Realty Co. v. County of Los Angeles* (1991) 1 Cal.4th 155, section 60 provides a three-part test to determine a change of ownership as follows: "'A "change in ownership" means [1] a transfer of a present interest in real property, [2] including the beneficial use thereof, [3] the value of which is *substantially equal to the value of the fee interest*.'" (*Pacific Southwest Realty Co., supra*, at p. 162, italics added.)

The application by which Fisher challenged the assessor's valuation of the Fisher real property, however, was not triggered by a change in ownership, but by her

20

contention that the Fisher real property needed to be reassessed to reflect that it had suffered a decline in value within the meaning of article XIII A, section 2, subdivision (b) of the California Constitution.  Therefore, section 60 is inapplicable here.

In its respondent's brief, the County understood Fisher's argument to assert, at least in part, that because Fisher owns a leasehold interest or merely a share of stock in GHI and not a fee simple in the land, the County may not assess property taxes on her real property interest.  The County responds by pointing out that section 60 does not require a fee simple interest in the land, but only an interest arranged under section 62.1, subdivision (a) that is substantially equal to a fee interest value.

In her reply brief, however, Fisher disclaims making the argument addressed by the County and characterizes it as "[w]rong chew toy number three."  She further denies arguing that her stock ownership in GHI is tax-exempt.

In sum, section 60 does not appear to have any bearing on this case.  We therefore also reject Fisher's argument challenging the Board's findings of fact and determination for omitting "any discussion or resolution of Ms. Fisher's short-term leasehold interest in The Groves that does not meet the [change in ownership] test under . . . Section 60."  (Boldface omitted.)

## V.

### ALLOCATION OF THE BURDEN OF PROOF

In her opening brief, Fisher contends the Board erred by misallocating the burden of proof and thus prejudicially denied Fisher the right to a fair administrative hearing.  Fisher's argument is without merit.

Section 321 of title 18 of the California Code of Regulations, referred to by the parties in their appellate briefs as "Property Tax Rule 321," provides in part:

"(a)  Subject to exceptions set by law, *it is presumed that the assessor has properly performed his or her duties.  The effect of this presumption is to impose upon the applicant the burden of proving that the value on the assessment roll is not correct,*

21

*or, where applicable, the property in question has not been otherwise correctly assessed*. The law requires that the applicant present independent evidence relevant to the full value of the property or other issue presented by the application.

"[¶] . . . [¶]

"(d)  Exceptions to subsection (a) apply in any hearing *involving the assessment of an owner-occupied single-family dwelling* or an escape assessment.  An owner-occupied single-family dwelling means a single-family dwelling *that is the owner's principal place of residence and qualifies for a homeowners' property tax exemption* pursuant to Revenue and Taxation Code section 218. . . .  In such instances, *the presumption in section 167* of the Revenue and Taxation Code affecting the burden of proof in favor of the applicant *who has supplied all information to the assessor* as required by law imposes upon the assessor the duty of rebutting the presumption by the submission of evidence supporting the assessment."  (Italics added.)

Section 167, in turn, provides:

"(a) Notwithstanding any other provision of law to the contrary, and except as provided in subdivision (b), *there shall be a rebuttable presumption affecting the burden of proof in favor of the taxpayer or assessee who has supplied all information as required by law to the assessor* in any administrative hearing involving the imposition of a tax on an owner-occupied single-family dwelling, *the assessment of an owner-occupied single-family dwelling pursuant to this division*, or the appeal of an escape assessment.

"[¶] . . . [¶]

"(c) For the purposes of this section, an owner-occupied single-family dwelling means a single-family dwelling that satisfies both of the following:

"(1) The dwelling is *the owner's principal place of residence*.

"(2) The dwelling qualifies for a homeowners' property tax exemption." (Italics added.)

22

The Board's findings of fact and determination stated in part: "The Board has weighed all of the evidence, both documentary and oral, presented by both parties and carefully considered the arguments advanced by each party. The Board notes that it is presumed that [the] Assessor has correctly performed its duties and that Applicant has the burden of proving that the property in question has not been correctly assessed. Property Tax Rule 321."

In her opening brief, Fisher argues the Board's findings of fact and determination "plainly discloses that the [Board] improperly placed the burden of proof concerning the value of the Fisher Land on the wrong party — that is, on Ms. Fisher, 'owner-occupant' of her own residential property." (Italics and fn. omitted.)

But Fisher fails to cite any evidence in the record that she met the conditions precedent to the presumption shifting in her favor — namely that the dwelling was her principal place of residence and qualifies for a homeowners' property tax exemption pursuant to section 218, within the meaning of Property Tax Rule 321(d) (Cal. Code Regs., tit. 18, § 321, subd. (d)) and section 167. She has also failed to prove that she supplied all information to the assessor as required by law to avail herself of the presumption in her favor according to those authorities.

In stating that Fisher had the burden of proving assessor error, the Board cited Property Tax Rule 321. There is no basis for any argument that the Board was laboring under a misunderstanding of the applicable law. Fisher cites no legal authority requiring the Board to make express findings under Property Tax Rule 321(d) or section 167. Fisher has therefore failed to demonstrate the Board erred in this regard.

**VI.**

**AUTHORIZATION FOR INDIVIDUAL ASSESSMENT UNDER SECTION 2188.10**

Fisher argues the Board erred by failing to require that the assessor prove that the directorate of GHI had authorized the separate assessment of the Fisher real

23

property in the first place within the meaning of section 2188.10, subdivision (c)(1). Section 2188.10 provides in part:

"(c) A separate assessment may not be made by the assessor under this section unless the following conditions are met:

"(1) The *governing board of the mobilehome park makes the request for separate assessment* and certifies that the request has been approved in the manner provided in the organizational documents of the entity owning the mobilehome park.

"[¶] . . . [¶]

"The entity owning the mobilehome park shall file an annual statement for each succeeding assessment year, on or before April 1, with the assessor, setting forth any changes to the required information known to the entity. The information provided pursuant to this section is not a public document and shall not be open to public inspection, except as provided in Section 408." (Italics added.)

Fisher does not provide any analysis of this code section or how it applies to her case. Section 2188.10 states it applies to requests *by* a governing board of a mobilehome park for a separate assessment of the pro rata portion of the real property in the park that had changed ownership pursuant to section 62.1, subdivision (c). (§ 2188.10, subds. (a)-(c).) Fisher does not explain how this code section relates to the resolution of the application before the Board or her complaint in the trial court.

Fisher argues she had expressly requested that the Board address whether GHI had authorized the assessor to make individual assessments, and that the Board failed to do so in violation of section 1611.5.

Section 1611.5 provides in relevant part: "Written findings of fact of the county board shall be made if requested in writing by a party up to or at the commencement of the hearing, and if payment of any fee or deposit which may be required to cover the expense of preparing the findings is made by the party prior to the conclusion of the hearing. . . . The written findings of fact shall fairly disclose the

24

board's determination of all material points raised by the party in his or her petition and at the hearing, including a statement of the method or methods of valuation used in appraising the property."

Fisher does not argue that she ever made a *written* request that the Board provide written findings of fact, that would have triggered section 1611.5. Even if she had, she has failed to cite relevant legal authority or even explain why a finding under section 2188.10, assuming it applies here, would constitute a "material point" upon which the Board would be obligated to make express written findings.

In any event, we assume the assessor performed its duties correctly. (See *Manson Construction Co. v. County of Contra Costa, supra*, 56 Cal.App.5th at p. 1087.) There is no authority requiring the Board to have made a finding under section 2188.10, subdivision (c) in its findings of fact and determination. Furthermore, we do not have the administrative record before us (neither did the trial court) to review the evidence presented on this issue, to the extent it was required.

## DISPOSITION

The judgment is affirmed.  Respondent shall recover costs on appeal.


MARKS, J.*

WE CONCUR:


O'LEARY, P. J.


SANCHEZ, J.

*Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| DONNA FISHER, | |
| Plaintiff and Appellant, | G060021 |
| v. | (Super. Ct. No. 30-2017-00941574) |
| COUNTY OF ORANGE, | O R D E R |
| Defendant and Respondent. | |

Respondent County of Orange has requested that our opinion filed on July 12, 2022, be certified for publication. It appears that our opinion meets the standards set forth in California Rules of Court, rule 8.1105(c)(2), (3), (6), and (8). The request is GRANTED. The opinion is ordered published in the Official Reports.

MARKS, J.*

WE CONCUR:

O'LEARY, P. J.

SANCHEZ, J.

*Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.