Filed 3/14/24  P. v. Jones CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>       Plaintiff and Respondent,<br><br>    v.<br><br>VINCENT JONES et al.,<br><br>       Defendants and Appellants. | C097084<br><br>(Super. Ct. No. 21FE002500) |

Defendants Vincent Jones and Marcus Grey appeal their convictions for premeditated attempted murder, shooting at an inhabited dwelling, assault with a firearm, and various firearm possession offenses.  They contend their attempted murder convictions lack sufficient evidence and that they were prejudiced by both the trial court's erroneous denial of Jones's motion to sever and the admission of one of Jones's social media conversations.  Jones separately contends his conviction for possessing an assault weapon violated the Second Amendment to the United States Constitution, while

1

Grey separately contends (1) he was improperly sentenced to a consecutive sentence and (2) his abstract of judgment must be corrected.

As for the issues raised by Jones, we disagree and affirm. We agree with Grey that his sentence for being a felon in possession of a firearm must by stayed pursuant to Penal Code[1] section 654 and his abstract of judgment must be corrected. We affirm Grey's judgment as modified.

FACTUAL AND PROCEDURAL BACKGROUND

Jamal P. slept on the couch of his brother's home near Mack Road and La Mancha Way where several other adults and children lived. By October 2020, Grey had also started living in the house. People staying at the house would often smoke cannabis and congregate on the back patio. The patio was surrounded by a six-foot fence and on the other side of the fence were several parking spaces, a street, and a large cement wall that separated the street from a freeway. Jamal testified that, while he did not own a firearm himself, firearms were present in the house and he could easily get a firearm if he ever needed one.

One morning, Grey wanted to smoke some of the cannabis that Jamal was smoking on the back patio. Jamal refused to share, causing Grey to become angry and threaten to fight Jamal. Jamal lost his temper and demanded Grey leave the house. Jamal's brother was awakened by the commotion and came downstairs to see Grey and Jamal arguing; Jamal's brother then fought Grey. At trial, the testimony was conflicted about whether another person joined the fight against Grey.

Grey sustained a swollen and cut lip and a swollen eye. Jamal's brother's girlfriend told Grey he needed to leave the house. As Grey left the house, Jamal heard him say " 'I got something for this house.' " Jamal's brother's girlfriend heard Grey

---

[1]     Section references are to the Penal Code unless indicated otherwise.

2

make a call to Jones and say that Jamal and his brother had "jumped" Grey and that Grey "got [*sic*] something for [them]." Grey went to the hospital and texted a picture of his swollen face to several people, including Jones, claiming that he was jumped by Jamal and his brother. Grey also sent a message to another person saying he needed to buy a gun and would be willing to pay $300 for it.

After midnight, Grey's friend Big Trap, who was in possession of a firearm, stopped by the house with two of his friends. Big Trap asked Jamal and his brother to explain what had happened to Grey. After the explanation, Big Trap indicated he did not believe the men. Big Trap also threatened to "put a hot one" on Jamal and threatened Jamal against visiting with Big Trap's child's mother. To Jamal, this was a threat to shoot him.

After 6:00 p.m. on October 23, 2020, Jamal was sitting on the back patio with his young niece and some friends, talking with his daughter on the phone. He heard a laugh that sounded like Jones's laugh coming from the other side of the fence surrounding the patio. A short time after the laugh, gunshots rang out in rapid succession. Jamal realized he had been shot and threw his niece into the house. Jamal ran upstairs and fell to the ground. He was taken to the hospital and survived. He was hit with a bullet in the arm and in the chest, the latter of which punctured his lung.

The Sacramento Police Department responded to a call of a shooting at the house. Twenty-four shell casings were found on the outside of the fence surrounding the back patio. Four bullet holes appeared in the fence and 10 bullet holes appeared in the house, with most of them hitting above the sliding glass door into the house. A bullet also hit the sliding glass door, and three bullet strikes were found inside the house. Officers contacted Jamal's brother and another person who was present at the house during the shooting. Both men had fired gunshots from the house following the shooting. The men were on probation and detained by officers.

3

Sacramento Police officers reviewed video footage from surrounding properties taken during the time of the shooting. In the footage, they saw a car parked near the patio surrounding the home where Jamal was staying. The driver and passenger got out of the car, and the person who was in the passenger seat then got into the driver's seat. He left the car running, while the person who had gotten out of the driver's seat walked toward the fence surrounding the back patio, returned, then walked back to the patio. Several seconds later, the person who walked to the fence is seen running back to the car and getting into the passenger seat before the driver pulls the car from the curb and drives away. In another camera angle, the person walking toward the back patio is seen walking to the fence before a glitch causes the video to freeze. The location of the frozen person walking to the fence is the location of the 24 bullet casings.

Jones was known to drive a car matching the car depicted in the video footage. A photograph taken of Jones and Grey 20 minutes after the shooting depicted them wearing clothes matching the clothes worn by the two men in the video footage, with Grey wearing clothes matching the clothes worn by the shooter. Also, both Jones's and Grey's cell phones were detected using cell phone towers near the scene of the shooting around the time of the shooting. After the shooting, their cell phones were detected using towers away from the scene of the shooting, but near to each other.

Jones and Grey were arrested in February 2021. During a search of the apartment Jones was staying at, officers discovered three firearms in an attic crawl space. One of the weapons was an assault weapon. None of the firearms were consistent with firearms that could fire the bullets or the casings discovered at the scene of the shooting. Jones, however, was known to possess a Glock-style nine-millimeter handgun with an extended magazine that was never recovered. The bullets and casings found at the scene of the shooting were consistent with having been fired from a Glock-style nine-millimeter handgun. Some of the bullets recovered at the scene of the shooting were also hollow

4

point bullets, which Jones was known to possess and which he messaged a friend about obtaining five days before the shooting.

Following their arrest, Jones and Grey were placed in an interview room together. They spoke in whispers about how they were each arrested and what each other said or should say to officers when interviewed. They often said they did not believe police officers had sufficient evidence against them because officers did not have the gun or access to their phones or social media accounts. Grey twice asked Jones whether officers found the gun used in the shooting and Jones said no. They also discussed trial strategy, such as whether they would assert their right to a speedy trial or whether any of the people living at the house would testify. Also during the conversation, Jones admitted to owning the assault weapon and two handguns found at the apartment where he was staying before his arrest.

During a search of Jones's cell phone, officers discovered a social media conversation between Jones and his girlfriend occurring two days after the shooting. In the conversation, the two were in an obvious quarrel, with Jones's girlfriend saying, "Keep doing what you doing[.] God don't like ugly[.] I told the police about that shit on Mack and lamancha to[o], and I got yo money," (*sic*) followed by, "See you in court." Jones immediately responded, "So you not gone give my money back[?]" (*sic*) and she responded, "No." The conversation continued, with Jones's girlfriend messaging in succession, "You shouldn't have hit me," "It's okay[;] you [are] [go]nna go down for murder," and "Bye, [V]innie[, I']m cool off you."

Jones responded, "I ain't hit you[,] but it's good[.] [K]eep them cards[,] imma call and get the shit turned off and I'm not going down for nothing[,] cus I ain't do nun." Jones's girlfriend insisted Jones had done something, he denied it, and then she called him a liar. During another conversation on February 6, 2021, Jones told his girlfriend to delete her conversations with him because she had talked about murder.

Defendants were charged with premeditated attempted murder, discharging a firearm at an inhabited dwelling, and assault with a firearm. While several firearm allegations were alleged as to each defendant, Grey was alleged to have personally used the firearm and caused great bodily injury, while Jones was alleged to have been armed with a firearm during the offenses. Grey was separately charged with being a felon in possession of the firearm used in the crime, while Jones was separately charged with possessing an assault weapon and three counts of being a felon in possession of a firearm, relating to the firearms discovered at the apartment he was living at the time of his arrest. Finally, Grey was alleged to have been previously convicted of a strike offense and serious felony conviction.

The jury convicted defendants as charged. The trial court found Grey had previously been convicted of a strike offense that also qualified as a serious felony conviction. The trial court also found aggravating factors in defendants' prior convictions and worsening criminal conduct. In total, the trial court sentenced Grey to 14 years to life, plus 14 years in prison, comprising of 14 years to life for the attempted murder conviction, plus 10 years for the attached firearm enhancement, and four years for the felon in possession of a firearm conviction. The trial court then imposed a concurrent 10 years for the shooting at an inhabited dwelling conviction and struck the attached firearm enhancement. The court struck or stayed the remaining sentences and enhancements.

Grey's abstract does not indicate by a checked box under the concurrent heading that the sentence for shooting at an inhabited dwelling was imposed concurrently to the attempted murder sentence. The abstract also lacks an entry for the total sentence imposed.

The trial court sentenced Jones to a total of seven years to life, plus four years four months, comprising of seven years to life for the attempted murder conviction, plus one year for the attached firearm enhancement, two years for one felon in possession

6

conviction, and eight months each for the remaining two felon in possession convictions. The trial court then imposed a concurrent five years for the shooting at an inhabited dwelling conviction, plus one year for the firearm enhancement attached to that count. The trial court stayed the sentences for Jones's remaining convictions and enhancements.

Defendants appeal.

DISCUSSION

I

*Substantial Evidence Supports Defendants' Convictions For Attempted Murder*

Defendants contend their convictions for attempted murder lack sufficient evidence. We disagree.

"In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.) " 'An appellate court must accept logical inferences that the [trier of fact] might have drawn from the evidence even if the court would have concluded otherwise.' " (*People v. Halvorsen* (2007) 42 Cal.4th 379, 419.) Before a verdict may be set aside for insufficiency of the evidence, a party must demonstrate " 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) Reviewing courts must consider all the evidence admitted at trial, even if erroneously admitted, to establish whether there was substantial evidence. (*Lockhart v. Nelson* (1988) 488 U.S. 33, 39-42.)

The elements of attempted murder are the specific intent to kill and " 'a direct but ineffectual act toward accomplishing the intended killing.' " (*People v. Houston* (2012) 54 Cal.4th 1186, 1217.) Additionally, section 664 applies a sentencing enhancement when the attempted murder was willful, deliberate, and premeditated. (§ 664, subd. (a).)

7

" 'There is rarely direct evidence of a defendant's intent. Such intent must usually be derived from all the circumstances of the attempt, including the defendant's actions.' " (*People v. Smith* (2005) 37 Cal.4th 733, 741.) Intent to kill may "be inferred from the defendant's acts and the circumstances of the crime." (*Ibid.*) Substantial evidence that a defendant's intent to kill was premeditated may be demonstrated by "planning activity, preexisting motive, and manner of killing." (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1069.) There is no requirement that all three factors be established or that any factor must be shown by direct evidence. (*People v. Perez* (1992) 2 Cal.4th 1117, 1124-1125.)

A

*Grey's Attempted Murder Conviction Is Supported By Sufficient Evidence*

Grey contends there was insufficient evidence to support his conviction for premeditated attempted murder because there was no evidence demonstrating he intended to kill Jamal in particular, as opposed to the other individuals involved in the altercation. Grey argues the evidence more strongly supports an inference that he intended to kill Jamal's brother or the other person involved in the fight, or that he merely intended to scare the residents of the house.

We do not see how Grey's intent to kill Jamal's brother, if present, would negate an intent to kill Jamal. Grey's preexisting motive toward Jamal and his brother was the same—both brothers were involved in the altercation that resulted in Grey's eviction from the house and facial injuries. Grey targeted Jamal and his brother in his statements of retribution and Grey's friend Big Trap confronted both Jamal and his brother. Grey's planning activity was also substantial. Upon leaving the house, Grey implied he would come back because he had "something for this house" and particularly Jamal and his brother. Grey then sent a text message looking for a gun and appears to have secured one from Jones for the exact purpose of shooting at the house he was evicted from.

Finally, the manner in which the shooting took place demonstrated more than just an intent to scare the residents of the house. The evidence demonstrated Grey

8

approached the fence surrounding the outside patio while Jamal was on the phone with his daughter and socializing with a group of people. It is reasonable to infer Grey overheard the conversation and identified Jamal as a person who was on the other side of the fence. Grey then fired *24 shots* in Jamal's general direction. Given that Grey could reasonably identify Jamal on the back patio, and the number of bullets fired in his direction, it was reasonable for the jury to find that Grey intended to specifically kill Jamal. Accordingly, substantial evidence supports Grey's conviction for premeditated attempted murder.

B

*Jones's Attempted Murder Conviction Is Supported By Sufficient Evidence*

Jones also challenges the sufficiency of the evidence supporting the jury's finding he intended to kill Jamal. The jury found Jones guilty as an aider and abettor. " 'A "person aids and abets the commission of a crime when he or she[ or they], acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." ' [Citation.] '[T]o be guilty of attempted murder as an aider and abettor, a person must give aid or encouragement with knowledge of the direct perpetrator's intent to kill and with the purpose of facilitating the direct perpetrator's accomplishment of the intended killing—which means that the person guilty of attempted murder as an aider and abettor must intend to kill.' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1054.)

Jones contends the evidence demonstrates he intended to aid Grey in shooting at the house and not in killing Jamal. But Jones did not drive with Grey to the front of the house to shoot at it. Instead, he drove with Grey to the back patio and waited as Grey walked to the wooden fence surrounding the area where the people living in the house were known to congregate. Shooting at a fence with people on the other side in an enclosed area is arguably much more likely to be lethal than shooting at the walls of a

9

multi-roomed house. Further, Grey told Jones about the altercation with Jamal and his brother. The evidence supported the inference that Jones then supplied Grey with a gun with an extended magazine and hollow point bullets. Given Jones's knowledge of Grey's animus towards Jamal, his furnishing of a firearm and large capacity magazine, and the circumstances of the shooting, a jury could reasonably infer Jones knew of Grey's intent to kill and intended to facilitate the killing. Accordingly, sufficient evidence supports Jones's conviction for premeditated attempted murder.

## II

### *The Trial Court Did Not Err By Denying Jones's Motion To Sever*

Jones moved to sever his firearm possession offenses from the offenses he was charged in common with Grey. Jones argued the possession charges were a different class of crime than the charges occurring on the date of the attempted murder and that he would be prejudiced by trying all the charges together. Grey submitted on the motion, adding nothing to Jones's argument. The trial court denied the motion, reasoning that the firearm possession evidence was cross-admissible to evidence related to the attempted murder, the charges were not unduly inflammatory, and the evidence tending to demonstrate guilt of the attempted murder related charges was not weak. Defendants contend this was error.[2] We disagree.

" 'The law favors the joinder of counts because such a course of action promotes efficiency.' " (*People v. Scott* (2015) 61 Cal.4th 363, 395.) Section 954 governs the joinder of criminal counts and states: "An accusatory pleading may charge two or more

---

[2]    Grey impliedly concedes he did not object to Jones's firearm charges being heard with defendants' common charges. Because Jones preserved and raised the severance issue on appeal and we will be addressing it, we will exercise our discretion to address Grey's appellate claim as well. (See *FCM Investments, LLC v. Grove Pham, LLC* (2023) 96 Cal.App.5th 545, 554 [a court may decline to apply forfeiture to advance the due administration of justice].)

10

different offenses connected together in their commission, . . . or two or more different offenses of the same class of crimes or offenses, under separate counts, . . . provided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately."

To prove error, defendants must show the statutory requirements for joinder were not met. (*People v. Walker* (1988) 47 Cal.3d 605, 622.) In the absence of such a showing, the party seeking severance must show a clear potential of prejudice exists, requiring that the charges be separately tried. (*People v. Osband* (1996) 13 Cal.4th 622, 666.)

Defendants do not argue the statutory requirements for joinder were not met, and thus their reliance on *Walker v. Superior Court* (1974) 37 Cal.App.3d 938 is misplaced. There, the defendant was charged with participating in an armed robbery and with possessing a firearm as a felon approximately three months after the robbery. (*Id*. at pp. 940-941.) No evidence was presented showing the same gun was involved in both offenses. (*Id*. at p. 940.) The court in *Walker* concluded that the two incidents lacked the requisite " 'common element,' " and were thus not of the same class for joinder under section 954. (*Walker*, at p. 941.) To the contrary, here, possession of a firearm by a felon was not only charged against Jones, but also against Grey, making the joined charges of the same class of crimes as required by section 954. Thus, *Walker* is inapposite, and defendants must predicate their claims of error on a showing of prejudice.

We review the court's ruling denying severance based on the lack of prejudice for an abuse of discretion. (*People v. Osband*, *supra*, 13 Cal.4th at p. 666.) " 'Refusal to sever may be an abuse of discretion where: (1) evidence on the crimes to be jointly tried would not be cross-admissible in separate trials; (2) certain of the charges are unusually likely to inflame the jury against the defendant; (3) a "weak" case has been joined with a "strong" case, or with another "weak" case, so that the "spillover" effect of aggregate

11

evidence on several charges might well alter the outcome of some or all of the charges; and (4) any one of the charges carries the death penalty or joinder of them turns into a capital case.' " (*People v. Scott*, *supra*, 61 Cal.4th at pp. 395-396.) "If the evidence underlying the charges in question would be cross-admissible, that factor alone is normally sufficient to dispel any suggestion of prejudice and to justify a trial court's refusal to sever properly joined charges. [Citation.] Moreover, even if the evidence underlying these charges would not be cross-admissible in hypothetical separate trials, that determination would not itself establish prejudice or an abuse of discretion by the trial court in declining to sever properly joined charges." (*People v. Soper* (2009) 45 Cal.4th 759, 774-775, italics omitted.)

We agree with defendants that the evidence of Jones's firearm possession at the time of his arrest was not cross-admissible as character evidence or strongly related to the attempted murder. Defendants' conversation in the police station after their arrest, however, was evidence demonstrating both that Jones possessed the three firearms and that defendants participated in the shooting. While the recording of the conversation could have conceivably been edited to remove Jones's statements regarding the firearms in his apartment, the evidence was still cross-admissible in some capacity.

Further, Jones's possession-related charges were not likely to inflame the jury because those charges were unrelated to any offense in which the firearms were used. While the charges introduced to the jury the fact that Jones was a felon, that evidence was not as inflammatory as Jones contends. The jury was not told the felony Jones had been previously convicted of and evidence of Jones's conviction was told to the jury as a brief stipulation in an otherwise lengthy trial. Further, many individuals involved in the shooting-related offenses, including victims, had records or were on probation. Indeed, firearm possession pervaded this case. Jamal testified that guns were a part of daily life and present in the household and among many of his acquaintances. Consequently,

12

Jones's status as a felon and his possession of firearms did not make him stand out as an especially bad actor in the context of the case.

Finally, both cases were strong. The evidence against Jones for the possession crimes was substantial—Jones admitted ownership of the guns and the guns were found in an apartment at which he was staying. The evidence supporting defendants' participation in the shooting was also substantial—video footage captured individuals, dressed in the same clothing as defendants and driving Jones's car, commit the shooting; cell phone location evidence placed defendants together near the location of the shooting at the time of the shooting; and defendants made admissions of their joint participation in a shooting. On balance, the trial court did not abuse its discretion by denying Jones's motion to sever his possession-related offenses from the shooting-related offenses.

III

*The Trial Court Did Not Abuse Its Discretion*

*By Admitting Jones's Social Media Conversation*

The trial court permitted the prosecution to introduce evidence of Jones's social media conversation with his girlfriend. As discussed at the time of the ruling, Jones's girlfriend messaged him that she told police about the shooting and that she was in possession of Jones's money. Jones responded by asking whether she was going to give his money back. The prosecutor indicated there was also a statement in the conversation by Jones's girlfriend that Jones committed acts of domestic violence against her; however, the prosecutor was willing to redact that statement. While the trial court believed the prosecutor demonstrated Jones had viewed the message before responding, the trial court left open the possibility for Jones to present further argument regarding the admission of the social media conversation. At trial, neither Jones nor Grey objected to the admission of the entire social media conversation, which included statements from Jones's girlfriend that Jones had hit her and a statement from Jones that he was "not going down for nothing[,] cus [he] ain't do nun."

13

Based on the foregoing, defendants contend the trial court erred by admitting the social media conversation without proof of the requisite foundational fact that Jones had read his girlfriend's allegation before responding to her message.[3]  We disagree.

We review the trial court's evidentiary rulings for an abuse of discretion. (*People v. Waidla* (2000) 22 Cal.4th 690, 717.)  "We will not reverse a court's ruling on such matters unless it is shown ' "the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*People v. Merriman* (2014) 60 Cal.4th 1, 74, quoting *People v. Brown* (2003) 31 Cal.4th 518, 534.)

Evidence of a statement by someone other than a witness testifying at the hearing and "offered to prove the truth of the matter stated" is generally inadmissible hearsay. (Evid. Code, § 1200, subds. (a), (b).)  However, "[e]vidence of a statement offered against a party is not inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his[, her, or their] adoption or his[, her, or their] belief in its truth." (Evid. Code, § 1221; see *People v. Waidla*, *supra*, 22 Cal.4th at p. 717.)

" 'In determining whether a statement is admissible as an adoptive admission, a trial court must first decide whether there is evidence sufficient to sustain a finding that: (a) the defendant heard and understood the statement under circumstances that normally would call for a response; and (b) by words or conduct, the defendant adopted the statement as true.' " (*People v. Charles* (2015) 61 Cal.4th 308, 322-323.)  " ' "To warrant admissibility, it is sufficient that the evidence supports a reasonable inference

---

[3]  Grey concedes his attorney did not object on these grounds in the trial court and argues his counsel was ineffective.  Because Jones preserved and raised this evidentiary issue on appeal and we will be addressing it, we will exercise our discretion to address Grey's appellate evidentiary claim as well.  (See *FCM Investments, LLC v. Grove Pham, LLC*, *supra*, 96 Cal.App.5th at p. 554.)

that an accusatory statement was made under circumstances affording a fair opportunity to deny the accusation; whether [the] defendant's conduct actually constituted an adoptive admission becomes a question for the [trier of fact] to decide." ' " (*People v. Zavala* (2008) 168 Cal.App.4th 772, 779.)

Here, there is evidence sufficient to sustain a finding that Jones read the portion of the message accusing him of participating in the shooting. Contrary to Jones's assertions, the evidence demonstrates that his girlfriend accused him of participating in the shooting *in the same message* where she told him she was in possession of his money. Jones's response pertained to the money and did not respond to the allegation that he was involved in the shooting. Because Jones responded to the last part of the message, it is reasonable to infer he read the entire message, including the first part of the message.

For this reason, defendants' reliance on *McDaniel* is misplaced. There, the prosecution admitted a text message exchange between the defendant and his mother. (*People v. McDaniel* (2019) 38 Cal.App.5th 986, 996-997.) During the contentious exchange, the defendant's mother accused the defendant of committing a robbery and the defendant did not respond. (*Ibid.*) The Court of Appeal concluded: "[I]n light of the distinctive nature of text messaging, the receipt of a text message does not automatically signify prompt knowledge of its contents by the recipient, and furthermore, the lack of a text response by the recipient does not preclude the possibility that the recipient responded by other means, such as a phone call." (*Id*. at p. 999, italics omitted.) The *McDaniel* court also noted that (1) the text exchange at issue "was not instantaneous but rather unfolded over a 20-minute period," (2) there "was no evidence as to whether and when [the defendant] read the text message in which his mother suggested he had robbed multiple local stores," and (3) the defendant "emphatically texted his mother, 'Stop telling lies!!!' " (*Ibid.*) Under these circumstances, the *McDaniel* court concluded, "[T]here was not an adequate showing that [the defendant] had in fact failed to respond to or deny his mother's indirect accusation[,] . . . a response or denial was not necessarily

15

warranted under the circumstances[, and] there was no other evidence of [the defendant's] reaction to his mother's statement that showed adoption of it on his part." (*Id*. at p. 1000.)

Here, by contrast, Jones responded instantaneously, and Jones responded to other matters contained in the message, not responding to only the allegation that he participated in the shooting. While Jones later denied being involved in the shooting, defendants did not argue exclusion of the evidence on this basis in the trial court and challenged only the foundation supporting Jones's adoptive admission. Defendants' failure to object constitutes forfeiture of the argument on appeal. (*People v. Dykes* (2009) 46 Cal.4th 731, 756.) Further, an objection would not have been futile as Jones argues. The trial court explicitly invited Jones to make further argument at a later date if he wished.

In any event, the trial court did not abuse its discretion by finding Jones's initial failure to deny his participation in the shooting an adoptive admission. In the context of that social media conversation, reasonable people would have denied participating in a shooting instead of merely asking whether they were going to get their money back. The later denials appear equivocal and made after repeated accusations and increased tempers. Thus, admitting the conversation was not arbitrary, capricious, or patently absurd. (*People v. Merriman*, *supra*, 60 Cal.4th at p. 74, quoting *People v. Brown*, *supra*, 31 Cal.4th at p. 534.) Accordingly, the trial court did not abuse its discretion by admitting Jones's social media conversation with his girlfriend.

IV

*Section 30605 Does Not Violate The Second Amendment*

Jones contends his conviction for possessing an assault weapon should be reversed because section 30605 violates the Second Amendment to the United States Constitution on its face. We disagree.

16

Initially, we note that defendant Jones did not argue in the trial court that section 30605 was unconstitutional. We will, however, excuse Jones's forfeiture because he raises only a facial challenge to the constitutionality of section 30605. (*In re Sheena K.* (2007) 40 Cal.4th 875, 887 [challenge based on facial constitutional defect "capable of correction without reference to the particular [trial court] record" can "be said to present a pure question of law" excusing forfeiture].)

" 'A facial challenge to the constitutional validity of a statute or ordinance considers only the text of the measure itself, not its application to the particular circumstances of an individual.' [Citation.] A facial challenge seeks to void the statute as a whole by showing that ' "no set of circumstances exists under which the [provision] would be valid," i.e., that the law is unconstitutional in all its applications.' " (*In re D.L.* (2023) 93 Cal.App.5th 144, 157.) "We join the California courts that have applied this standard when evaluating facial challenges to gun regulations . . . . (*People v. Alexander* (2023) 91 Cal.App.5th 469, 480 . . . [§§ 29800 subd. (a)(1), 30305, subd. (a)(1) prohibiting felons from possessing firearms and ammunition, are facially valid because the challenged conduct is not covered by the Second Amend.]; *Regina v. State of California* (2023) 89 Cal.App.5th 386, 401, 403-404 [rejecting facial constitutional challenge to § 28220, subd. (f)(4) because Department of Justice notification to dealer for firearms transfer does not implicate the right to bear arms].)" (*In re D.L.*, at p. 157.)

Jones acknowledges we have decided this issue against him in *People v. Bocanegra* (2023) 90 Cal.App.5th 1236. Indeed, in *Bocanegra*, we applied the test announced in *District of Columbia v. Heller* (2008) 554 U.S. 570 to conclude section 30605's prohibition on the possession of assault weapons did not violate the Second Amendment. (*Bocanegra*, at p. 1255.) We reasoned the firearms prohibited by that provision were dangerous and unusual weapons not " 'typically possessed by law-abiding citizens for lawful purposes' "; rather, they were " 'only slightly removed from M-16-

17

type weapons that *Heller* likewise appeared to conclude were outside the scope of the Second Amendment's guarantee.' " (*Id.* at pp. 1250-1251.)

Jones argues our conclusion in *Bocanegra* was wrong because it left unanswered "whether, in light of *Bruen*, one state, i.e., California, can lawfully prohibit possession of a firearm that is considered 'in common use' throughout the United States as a whole." (Citing *New York State Rifle & Pistol Assn., Inc. v. Bruen* (2022) 597 U.S. 1.) Relying on Justice Alito's concurrence in *Caetano v. Massachusetts* (2016) 577 U.S. 411, Jones argues that because assault weapons are not prohibited in a majority of states, they cannot be prohibited here.

First, contrary to Jones's assertion, in *Bocanegra* we did consider the fact that assault weapons were not prohibited in other jurisdictions. Specifically, we reasoned, "[T]he scope of our concern is limited to California and the constitutionality of section 30605. And, in this regard, we note section 30605 and its predecessor have been upheld repeatedly over more than 30 years. We further note that, while it is but one jurisdiction, it is difficult to conceive of California as an 'outlier' . . . given California's outsized population, economy, cultural influence, and, most importantly, its 30-year history and tradition of assault weapon regulation. Moreover, since the passage of the [Roberti-Roos Assault Weapon Control Act] in 1989, several states have followed California's lead and passed laws banning assault weapons in at least some form, most recently in 2023. [Citations.] The United States Congress did the same, enacting an assault weapons ban in 1994, although it had a 10-year sunset provision." (*People v. Bocanegra*, *supra*, 90 Cal.App.5th at p. 1253.)

Second, Jones's reliance on *Caetano* is misplaced because he relies on Justice Alito's concurrence, which is not binding authority. (*Duran v. U.S. Bank National Assn.* (2018) 19 Cal.App.5th 630, 644, fn. 9.) The opinion in *Caetano* was a *per curiam* opinion remanding the case to the Supreme Judicial Court of Massachusetts to reconsider its holding in light of the standard announced in *Heller*. (*Caetano v. Massachusetts*,

18

*supra*, 577 U.S. at pp. 411-412.)  We do not read *Heller*'s limitation of the right to bear arms to weapons " 'in common use' " (*District of Columbia v. Heller*, *supra*, 554 U.S. at p. 627) to require a granular and comprehensive review of gun ownership statistics to discern the line dividing permissible from impermissible regulation.  Indeed, *Heller* did not address the number of "M-16 rifles and the like" in circulation when it suggested such weapons may be "banned."  (*Ibid*.)  Moreover, mere statistics on the relative scarcity or ubiquity of a weapon may well be due to factors that are not relevant to *Heller*'s analytical approach.  Instead, the analysis of whether a weapon is dangerous and unusual is focused on historical analogy (*id*. at pp. 592-595, 627 [compiling 17th and 18th century sources in support of "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons' "]) and courts must consider "how and why the regulations burden a law-abiding citizen's right to armed self-defense" (*New York State Rifle & Pistol Association, Inc. v. Bruen*, *supra*, 597 U.S. at p. 29).  We engaged in this analysis in *People v. Bocanegra*, *supra*, 90 Cal.App.5th at pages 1250-1251, and Jones's unsupported assertions that assault weapons are in common usage do not convince us to alter our conclusion.

V

*Section 654 Required The Trial Court To Stay The Sentence For Grey's Firearm Possession Conviction And His Abstract Of Judgment Contains Errors*

Grey contends the trial court erred under section 654 because it failed to stay the sentence imposed for his felon in possession of a firearm conviction.  The People contend, "[T]he trial court could draw the reasonable inferences that Grey intended to unlawfully possess a firearm before he used it in the attempted murder, and he possessed a firearm following the crime."  We agree with Grey.

Grey argues section 654 precludes multiple punishments in his case because the evidence demonstrates he harbored the same intent and objective when possessing the firearm as he did when shooting it at a group of people and attempting to kill Jamal.

19

"The determination whether [Grey] acted pursuant to a single intent and objective is a factual one, and we uphold the trial court's determination where supported by substantial evidence." (*People v. Chung* (2015) 237 Cal.App.4th 462, 469.)

In *People v. Bradford* (1976) 17 Cal.3d 8, our Supreme Court held section 654 prohibited separate punishments for assault with a deadly weapon upon a peace officer and possession of a firearm by an ex-felon where the defendant wrested away the officer's gun and shot at the officer after the officer stopped the defendant for speeding. (*Bradford*, at pp. 13, 22-23.) Our Supreme Court reasoned the defendant's possession of the officer's revolver "was not 'antecedent and separate' from his use of the [gun] in assaulting the officer." (*Id*. at p. 22.)

In *Ratcliff*, the defendant committed two armed robberies and was arrested later the same morning, with the loaded handgun in his possession. (*People v. Ratcliff* (1990) 223 Cal.App.3d 1401, 1404-1405.) On appeal, the defendant challenged the consecutive term imposed for the felon in possession of a firearm conviction, contending that the term should be stayed under section 654, "because the firearm use and being [a felon] in possession of a concealable firearm were part of a continuous transaction." (*Ratcliff*, at pp. 1407-1408.) The court rejected his argument, explaining: "[T]he crime is committed the instant the felon in any way has a firearm within his control. [¶] . . . [¶] In the instant case, the evidence showed that [the] defendant used a handgun to perpetrate two robberies separated in time by about an hour and a half. He still had the gun in his possession when he was arrested half an hour later. Unlike in *Bradford* . . . , the defendant already had the handgun in his possession when he arrived at the scene of the first robbery. A justifiable inference from this evidence is that [the] defendant's possession of the weapon was not merely simultaneous with the robberies, but continued before, during and after those crimes. Section 654 therefore does not prohibit separate punishments." (*Ratcliff*, at pp. 1410-1413, italics omitted.)

The facts of Grey's case are more analogous to *Bradford*. The evidence demonstrated Grey came into possession of the gun from Jones before the shooting and for the purpose of committing the shooting. Grey's motivation to obtain a gun materialized after the altercation with Jamal and his brother and apparently concluded with Grey receiving a gun from Jones. Importantly, the evidence does not suggest that Grey came into possession of the firearm an appreciable period before the shooting and possessed it for independent reasons apart from the shooting. The evidence further demonstrated that Jones disposed of or concealed the gun after the shooting. The firearm was never recovered, and Jones indicated during defendants' conversation at the police station that he concealed the firearm from officers. No evidence was admitted at trial to suggest that Grey possessed the firearm used in the shooting outside the circumstances of the shooting. Thus, Grey held the same intent and objective when possessing the firearm as he did when attempting to kill Jamal and shooting at the house. Accordingly, Grey's sentence for possession of a firearm by a felon must be stayed pursuant to section 654.

We further agree with Grey that his abstract of judgment contains errors, including that the box was not checked to indicate the shooting at an inhabited dwelling sentence was imposed concurrently and Grey's total prison term was not stated. Because the clerk must prepare an amended abstract of judgment given our modification of the judgment, these corrections should be included in the amended abstract.

DISPOSITION

Jones's judgment is affirmed. Grey's judgment is modified to reflect the four-year sentence for being a felon in possession of a firearm (count 4) is stayed pursuant to section 654. As modified, the judgment is affirmed. The trial court shall prepare an amended abstract of judgment for Grey, which also indicates the concurrent nature of his shooting at an inhabited dwelling sentence (count 2) and includes a total sentence imposed, and forward a certified copy to the Department of Corrections and Rehabilitation.

/s/
ROBIE, Acting P. J.

We concur:

/s/
DUARTE, J.

/s/
ASHWORTH, J.*

* Judge of the El Dorado County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.